UNITED STATES OF AMERICA
MERIT SYSTEMS PROTECTION BOARD
2022 MSPB 42

Docket No. SF-1221-15-0660-W-1

**Anthony G. Salazar,**

**Appellant,**

**v.**

**Department of Veterans Affairs,**

**Agency.**

December 13, 2022

Anthony G. Salazar, Pico Rivera, California, pro se.

Steven R. Snortland, Esquire, Los Angeles, California, for the agency.

Wonjun Lee, Esquire, Oakland, California, for amicus curiae, the Office of Special Counsel.

Noah J. Fortinsky, Esquire, Washington, D.C., for amicus curiae, the Office of Special Counsel.

**BEFORE**

Cathy A. Harris, Vice Chairman
Raymond A. Limon, Member
Tristan L. Leavitt, Member

## OPINION AND ORDER

¶1 The appellant has filed a petition for review of the initial decision denying his request for corrective action in this individual right of action (IRA) appeal. For the following reasons, we GRANT the petition for review. We AFFIRM the initial decision IN PART, to the extent it determined the appellant proved the agency took personnel actions against him and his disclosures were a contributing

factor under the knowledge/timing test. However, we otherwise VACATE the initial decision and REMAND the appeal for further adjudication.

BACKGROUND

¶2        The appellant was a Motor Vehicle Operator Supervisor in the agency's Greater Los Angeles Healthcare System. Initial Appeal File (IAF), Tab 6 at 27-28. Between November 2012, when his former first-level supervisor left her position as Chief of Transportation, and July 2014, when she was replaced, the appellant assumed the duties of the Chief of Transportation position. Hearing Transcript (HT) at 10, 13-16, 43-44 (testimony of the appellant). Both the Motor Vehicle Operator Supervisor and Chief of Transportation were required to oversee the vehicle fleet and fleet cards.[1] IAF, Tab 6 at 27-28, Tab 15 at 11; HT at 66-68 (testimony of the appellant).

¶3        On October 10, 2013, the appellant sent his supervisor an email reporting that an employee for the Greater Los Angeles Healthcare System's Community Care Program had stored the keys and fleet cards for the vehicles assigned to the Program in an unsecured location. IAF, Tab 5 at 62; HT at 16-19 (testimony of the appellant). On October 24, 2013, the appellant emailed his supervisor, as well as his second-level supervisor. IAF, Tab 5 at 63. In this email, he reported further details related to the failure of the Community Care Program to secure vehicle keys and cards, including that vehicles were missing and that there may have been fraudulent card use. *Id.*; HT at 19-20 (testimony of the appellant). Although these vehicles and cards were assigned to the Program, the appellant was responsible for overseeing their security. HT at 67-68 (testimony of the appellant).

---

[1] A fleet card is a credit card for gasoline that goes with an individual fleet vehicle. HT at 67 (testimony of the appellant).

¶4	In January 2014, the agency convened an Administrative Investigation Board (AIB) to look into the theft of fleet vehicles, including those assigned to the Community Care Program. IAF, Tab 8 at 4. The AIB submitted its report 2 months later, which included findings that the appellant's supervisor failed to adequately oversee fleet vehicles and cards. *Id.* at 14-20. It made recommendations, including that "disciplinary or other administrative action should be taken with respect to" the issues identified in its report. *Id.* at 23. As a result, the supervisor received a letter of counseling, for which he held the appellant partially responsible. HT at 230-32, 245 (testimony of the appellant's supervisor).

¶5	In March 2014, the appellant requested training in fleet management, which was to occur in May 2014. IAF, Tab 5 at 72-73. His supervisor responded that he "wanted to hold off a while . . . [because they] need[ed] to do a number of things before then in order to take full advantage of the training." *Id.* at 72; HT at 251-52 (testimony of the appellant's supervisor). He permitted the appellant to receive the training in September 2014. HT at 249-50 (testimony of the appellant's supervisor). In June 2014, the supervisor changed the appellant's performance standards. IAF, Tab 5 at 26-30, 49-52. After observing his performance on the new standards for 3 months, the supervisor issued the appellant an unacceptable performance notification and a performance improvement plan (PIP). *Id.* at 103-09. The appellant was on the PIP for 3 months when his supervisor proposed his removal for unacceptable performance. IAF, Tab 6 at 4-15. Following the appellant's response, the agency removed him effective February 4, 2015. IAF, Tab 5 at 16.

¶6	The appellant asserted in this IRA appeal that the actions beginning with the delay of his training in May 2014, and ending with his removal in February 2015, were in reprisal for his two disclosures in October 2013. IAF, Tab 14 at 7-8, Tab 15 at 3-5, Tab 17 at 5-6. The administrative judge found that the Board had jurisdiction over the appeal and held a hearing. IAF, Tab 28,

Initial Decision (ID) at 1-2, 14 n.7. He then issued an initial decision in which he found that the appellant made his disclosures in the normal course of his duties. ID at 19-26. The administrative judge determined that, pursuant to 5 U.S.C. § 2302(f)(2) (2016), such disclosures are protected only if the employee proves by preponderant evidence that the agency took a given personnel action with an improper retaliatory motive. ID at 18-19, 29.

¶7      Upon finding no direct evidence of retaliatory motive, the administrative judge held that circumstantial evidence supporting an inference of an actual purpose to reprise could encompass the following factors: (1) whether the agency officials responsible for the personnel actions knew of the appellant's disclosures and the timing of those actions; (2) the strength or weakness of the agency's reasons for the actions; (3) whether the disclosures were directed personally at the agency officials responsible for the actions; (4) any desire or motive to retaliate against the appellant; and (5) whether the agency took similar personnel actions against similarly situated employees who had not made disclosures. ID at 30. After looking at the totality of the evidence, the administrative judge concluded that the appellant failed to prove by preponderant evidence that the agency took the personnel actions with the actual purpose of retaliating against him. ID at 19, 26-52. Thus, he found that the appellant did not prove that his disclosures were protected and denied corrective action. ID at 52-53.

¶8      The appellant has filed a petition for review, disagreeing with the standard articulated by the administrative judge. Petition for Review (PFR) File, Tab 1 at 8-10. He also has challenged the administrative judge's factual findings, as well as his determination that he could not consider the appellant's due process and harmful error defenses. *Id.* at 9-32. The Office of Special Counsel (OSC) has filed an amicus curiae brief. PFR File, Tab 5; *see* 5 C.F.R. § 1201.34(e) (setting forth the procedures for amicus curiae). The agency has not responded to the petition for review, and neither party has responded to OSC.

ANALYSIS

<u>The administrative judge erred by applying 5 U.S.C. § 2302(f)(2) because the appellant's principal job function was not to regularly investigate and disclose wrongdoing.</u>

¶9      The administrative judge applied 5 U.S.C. § 2302(f)(2) (2016) to find that the appellant's disclosures were not protected.  For the reasons that follow, we find that the appellant's disclosures should have been analyzed under 5 U.S.C. § 2302(b)(8) and not subjected to the slightly higher burden of 5 U.S.C. § 2302(f)(2).

> *The enactment of 5 U.S.C. § 2302(f)(2) as part of the Whistleblower Protection Enhancement Act of 2012 (WPEA) clarified the scope of 5 U.S.C. § 2302(b)(8).*

¶10     Under the Whistleblower Protection Act (WPA), which was in place before the WPEA, agencies generally were prohibited from engaging in reprisal for "any disclosure" that an employee reasonably believed evidenced certain categories of wrongdoing.  5 U.S.C. § 2302(b)(8) (2011).  A Senate report accompanying the bill that was enacted as the WPEA indicated that judicial and Board interpretations of the WPA had "narrow[ed] the scope of protected disclosures" in a manner that "undermine[d] the WPA's intended meaning."  S. Rep. No. 112-155, at 4-6 (2012), *as reprinted in* 2012 U.S.C.C.A.N. 589, 592-94.  Most relevant to our discussion here, the report stated disagreement with the conclusion of the decision in *Willis v. Department of Agriculture*, 141 F.3d 1139, 1140-41 & n.1, 1144 (Fed. Cir. 1998), that disclosures made by a Government inspector concerning private parties' noncompliance with Federal Government approved conservation plans were not protected under the WPA because he made them as part of his regular job duties.  S. Rep. No. 112-155, at 5-6 & n.13.  Accordingly, the WPEA added the following provision:

> If a disclosure is made during the normal course of duties of an employee, the disclosure shall not be excluded from subsection [5 U.S.C. § 2302(b)(8)] if [the agency takes a personnel action] with respect to that employee in reprisal for the disclosure.

WPEA, Pub. L. No. 112-199, § 101(b)(2)(C), 126 Stat. 1465, 1466 (codified at 5 U.S.C. § 2302(f)(2) (2012)).

¶11        In adopting this language, the Senate report stated that it was overturning prior case law, including *Willis*, and clarifying that a whistleblower is not deprived of protection just because the disclosure was made in the normal course of an employee's duties.  S. Rep. No. 112-155, at 5.  However, the Senate report also explained that an appellant making a disclosure under 5 U.S.C. § 2302(f)(2) was required to show that "actual reprisal occurred," i.e., that "the agency took the action with an improper, retaliatory motive."  *Id.*  Thus, the report observed that the language of section 2302(f)(2) imposed an "extra proof requirement" or "slightly higher burden" for proving the disclosure was protected.  S. Rep. No. 112-155, at 5-6.  In explaining the reason for this higher burden, the report identified the concern of "facilitat[ing] adequate supervision of employees, such as auditors and investigators, whose job is to regularly report wrongdoing":

> Personnel actions affecting auditors, for example, would ordinarily be based on the auditor's track-record with respect to disclosure of wrongdoing; and therefore a provision forbidding any personnel action taken because of a disclosure of wrongdoing would sweep too broadly.  However, it is important to preserve protection for such disclosures, for example where an auditor can show that she was retaliated against for refusing to water down a report.

*Id.*

¶12        In *Day v. Department of Homeland Security*, 119 M.S.P.R. 589, ¶ 18 (2013), the Board observed that the WPA's definition of disclosure contained in 5 U.S.C. § 2302(b)(8) was ambiguous as to whether disclosures made in the normal course of an employee's duties were protected.  It found the new provision at 5 U.S.C. § 2302(f)(2), which was enacted as part of the WPEA, clarified this ambiguity to provide that these types of disclosures were covered under the WPA.  *Day*, 119 M.S.P.R. 589, ¶¶ 18-26.  The version of 5 U.S.C. § 2302(f)(2) enacted as part of the WPEA was the version in place when the

events in this case occurred and when the administrative judge issued his May 2016 initial decision.

*The National Defense Authorization Act for Fiscal Year 2018 (2018 NDAA) explicitly clarified the intent of 5 U.S.C. § 2302(f)(2).*

¶13    In May 2017, the Senate Committee on Homeland Security and Governmental Affairs recommended passage of a bill titled the Office of Special Counsel Reauthorization Act of 2017. S. Rep. No. 115-74, at 1 (2017). The bill proposed to add language to 5 U.S.C. § 2302(f)(2) providing that, "[i]f a disclosure is made during the normal course of duties of an employee, *the principal job function of whom is to regularly investigate and disclose wrongdoing*, . . . the disclosure shall not be excluded from subsection [5 U.S.C. § 2302(b)(8)] if . . . [the agency takes a personnel action] with respect to the disclosing employee in reprisal for the disclosure." S. Rep. No. 115-74, at 21-22 (emphasis added). In recommending this modification, the Committee stated that it "clarifies that an employee with a principal job function of investigating and disclosing wrongdoing will not be excluded from whistleblower protection laws" if he can prove that actual reprisal occurred. *Id.* at 8; *see* S. Rep. No. 112-155, at 5 (containing the "actual reprisal" language).

¶14    An amended version of the bill passed the Senate on August 1, 2017, and was referred to the House of Representatives 3 days later, still containing the proposed change to section 2302(f)(2). An Act to Reauthorize the Office of Special Counsel, and for other purposes, S. 582, 115th Cong. § 4 (2017); Communication from the Clerk of the House, 163 Cong. Rec. H6587 (Aug. 4, 2017). The language of the bill, as passed by the Senate, later appeared, with relatively few changes, in the 2018 NDAA, Pub. L. No. 115-91, § 1097, 131 Stat. 1283, 1615-23 (2017), under the heading "Office of Special Counsel Reauthorization." In particular, the 2018 NDAA contained an amendment to

5 U.S.C. § 2302(f)(2) that was identical to the version in the Senate bill, save for one non-substantive change that is not relevant to our discussion here.[2] *Compare* Pub. L. No. 115-91, § 1097(c)(1)(B)(ii), 131 Stat. at 1618, *with* S. 582, 115th Cong. § 4 (reflecting that the phrase "referred to" was moved from the middle to the beginning of a parenthetical). Accordingly, we find that 5 U.S.C. § 2302(f)(2) now expressly applies only to employees whose principal job functions are to regularly investigate and disclose wrongdoing.

¶15    Although not raised by the parties, we must address whether this amended language applies to this appeal, given that the actions at issue here took place before the 2018 NDAA was enacted. We find that it does.[3]

¶16    The proper analytical framework for determining whether a new statute should be given retroactive effect was set forth by the U.S. Supreme Court in *Landgraf v. USI Film Products*, 511 U.S. 244, 280 (1994):

> When a case implicates a [F]ederal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, of course, there is no need to resort to judicial default rules. When, however, the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that

---

[2] Apart from the Senate report on S. 582, discussed above, the legislative history is silent as to the purpose of the 2018 NDAA's amendment to 5 U.S.C. § 2302(f)(2). For example, although it appears that the Senate and House agreed in November 2017 to add the Senate's proposed version of section 2302(f)(2) to the 2018 NDAA, the accompanying report provides no explanation. H.R. Rep. No. 115-404, at 338-39 (2017) (Conf. Rep.).

[3] Given our determination that the 2018 NDAA's amendment to 5 U.S.C. § 2302(f)(2) is retroactive, it is unnecessary to consider OSC's motion seeking leave to file an additional pleading about the 2018 NDAA as it relates to this appeal. PFR File, Tab 9 at 3.

it does not govern absent clear congressional intent favoring such a result.

*E.g.*, *Edwards v. Department of Labor*, 2022 MSPB 9, ¶ 31 (identifying *Landgraf* as providing the proper analytical framework for determining whether a new statute should be given retroactive effect); *Day*, 119 M.S.P.R. 589, ¶ 7 (same). The first step under *Landgraf* is to determine if Congress expressly defined the temporal reach of the statute. *Landgraf*, 511 U.S. at 280; *Day*, 119 M.S.P.R. 589, ¶¶ 7-8. If so, that command is controlling. *Landgraf*, 511 U.S. at 280. Here, the 2018 NDAA amending 5 U.S.C. § 2302(f)(2) is silent regarding retroactivity. Pub. L. No. 115-91, § 1097(c)(1)(B)(ii), 131 Stat. at 1618; *see Edwards*, 2022 MSPB 9, ¶¶ 29, 32 (so finding as to the 2018 NDAA's amendment of 5 U.S.C. § 2302(b)(9)(C)).

¶17     We must therefore determine whether the amended provision impairs the parties' respective rights, increases a party's liability for past conduct, or imposes new duties with respect to past transactions. *Landgraf*, 511 U.S. at 280. For the reasons that follow, we find that the 2018 NDAA's modification of 5 U.S.C. § 2302(f)(2) does not have an impermissible retroactive effect under *Langraf* because it does not alter the parties' respective rights or liabilities, and does not impose new duties to past transactions when compared to the earlier version of the statute initially contemplated by Congress as part of the WPEA.

¶18     When legislation clarifies existing law, its application to preenactment conduct does not raise concerns of retroactivity. *Day*, 119 M.S.P.R. 589, ¶ 10. In determining whether a new law clarifies existing law, "[t]here is no bright-line test." *Id.*, ¶ 11 (quoting *Levy v. Sterling Holding Co.*, 544 F.3d 493, 506 (3d Cir. 2008) (citation omitted)). However, "[s]ubsequent legislation declaring the intent of an earlier statute is entitled to great weight." *Id.* (quoting *Red Lion Broadcasting Co. v. Federal Communications Commission*, 395 U.S. 367, 380-81 (1969)). Other factors relevant in determining whether a legislative enactment clarifies, rather than effects a substantive change in, existing law are the presence

of ambiguity in the preceding statute and the extent to which the new law resolves the ambiguity and comports with both the prior statute and any prior administrative interpretation. *Id.* (citing *Levy*, 544 F.3d at 507 (finding these factors "particularly important" for "determining whether a new regulation merely 'clarifies' existing law") (citations omitted)).

¶19    The first of these factors, expressions of legislative intent, weighs in favor of finding that the amended language of 5 U.S.C. § 2302(f)(2) merely clarified its predecessor. In making this determination, we look to the legislative history of S. 582. When legislative history relates to prior drafts of a statute that did not change before passage, the Board may rely on that history in interpreting the enacted statute. *See Ganski v. Department of the Interior*, 86 M.S.P.R. 32, ¶ 12 & n.2 (2000) (relying on legislative history for a bill with the same language as the WPA that was pocket vetoed to interpret the enacted WPA); *Special Counsel v. Santella*, 65 M.S.P.R. 452, 462 & n.9 (1994) (considering the legislative history for a bill that never became law in interpreting a similar change eventually effectuated as part of the WPA). Here, the legislative history of the 2018 NDAA does not explain the purpose of the modification to the WPEA's version of 5 U.S.C. § 2302(f)(2). However, S. 582 included the same clause at issue here, later enacted as part of the 2018 NDAA, limiting the scope of 5 U.S.C. § 2302(f)(2) to disclosures made during the normal course of duties of an employee whose "principal job function . . . is to regularly investigate and disclose wrongdoing." Further, the 2018 NDAA was enacted in December 2017, less than 5 months after the Senate passed S. 582 in August of the same year. Therefore, we find it appropriate to rely on the statement of the Senate Committee on Homeland Security and Governmental Affairs that S. 582 was intended to clarify in 5 U.S.C. § 2302(f)(2) that employees whose principal job functions are to investigate and disclose wrongdoing are not excluded from whistleblower protections. S. Rep. No. 115-74, at 8. Accordingly, we conclude that the intent

of Congress in adopting the relevant language at issue here was to clarify 5 U.S.C. § 2302(f)(2).[4]

¶20　　　We next turn to the question of whether the prior version of 5 U.S.C. § 2302(f)(2) was ambiguous and, if so, whether that ambiguity is resolved by the 2018 NDAA in a manner that comports with the prior statute and administrative interpretation.　We find that the WPEA's version of section 2302(f)(2) was ambiguous regarding what types of employees that provision was meant to cover, and that the 2018 NDAA resolved that ambiguity.　The administrative judge in *Acha v. Department of Agriculture*, MSPB Docket No. DE-1221-13-0197-W-2, applied the heightened standard to a Forest Service purchasing agent.　After the case was appealed, OSC filed an amicus brief arguing that Congress did not intend for the new heightened standard of section 2302(f)(2) to apply to a Federal employee whose core job functions did not require investigating and reporting wrongdoing.　*See* Brief on Behalf of the United States Office of Special Counsel as Amicus Curiae in Support of Petitioner-Appellant and in Favor of Reversal at 10-11, *Acha v. Department of Agriculture*, 841 F.3d 878 (10th Cir. 2016).

¶21　　　Because of the confusion over this issue, OSC requested of Congress a clarifying amendment, which was then included in the OSC reauthorization bill along with other legislative requests from OSC.[5]　The clarifying amendment resolved this ambiguity and, as discussed above, comports with how Congress

---

[4] In *Edwards*, 2022 MSPB 9, ¶¶ 29-33, we found that the expansion of 5 U.S.C. § 2302(b)(9)(C) to include additional protected activities did not apply retroactively.　In doing so, we observed that nothing in the 2018 NDAA, S. 582, or the latter's bill report indicated that it was intended to clarify an existing law.　*Id.*, ¶ 33 n.11.　Because bill report S. Rep. No. 115-74 contains such a statement as it concerns the change to 5 U.S.C. § 2302(f)(2), we find the situation distinguishable from *Edwards*, and we do not apply the same analysis.　*See* S. Rep. No. 115-74, at 8.

[5] OSC's amicus brief was submitted over a month after the House Committee on Oversight and Government Reform had already voted to the floor its version of an OSC reauthorization bill, H.R. 4639, which is why the issue was not addressed in the House bill.

described its purposes for the original language in the WPEA. Thus, we find that the 2018 NDAA's version of 5 U.S.C. § 2302(f)(2) may be applied retroactively in this case.

> *The appellant's principal job function was not to regularly investigate and disclose wrongdoing.*

¶22   Turning back to the facts of this appeal, the appellant made his disclosures as part of his normal duties as a Motor Vehicle Supervisor. HT at 62 (testimony of the appellant). Nonetheless, it is apparent that 5 U.S.C. § 2302(f)(2), as recently clarified in the 2018 NDAA, does not apply to him. Section 2302(f)(2) includes only employees whose principal job functions are regularly investigating and disclosing wrongdoing. The appellant's principal job functions included supervising, scheduling, and monitoring staff, and ensuring good relationships with customers.[6] IAF, Tab 5 at 49-51, Tab 15 at 11-15. Although his position description indicated that he conducted "audits as directed," this potential assignment was listed among a number of "General Administration and Operational Duties," and there is no evidence that the agency routinely requested that he conduct audits or that conducting audits was the reason his position existed. IAF, Tab 15 at 12. Therefore, the appellant's disclosures fall under the generally applicable 5 U.S.C. § 2302(b)(8), rather than 5 U.S.C. § 2302(f)(2).

The appellant established a prima facie case of whistleblower retaliation.

¶23   To establish a prima facie case of reprisal for a disclosure under 5 U.S.C. § 2302(b)(8), an appellant must prove, by preponderant evidence, that: (1) he

---

[6] We have considered the appellant's principal duties in his assigned position of Motor Vehicle Supervisor at the time he made his disclosures. Although the appellant was performing the duties of the Chief of Transportation, he was not officially assigned to this position, but rather was "fill[ing] in" as required by his position description. HT at 15 (testimony of the appellant); IAF, Tab 15 at 14. There is no indication that the Chief of Transportation was principally tasked with investigating and disclosing wrongdoing.

made a disclosure that a reasonable person in his position would believe evidenced any violation of any law, rule, or regulation, or gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety; and (2) the disclosure was a contributing factor in the agency's decision to take or fail to take a personnel action as defined by 5 U.S.C. § 2302(a). 5 U.S.C. § 2302(b)(8); *Webb v. Department of the Interior*, 122 M.S.P.R. 248, ¶ 6 (2015). Because the administrative judge found that the appellant did not make protected disclosures under 5 U.S.C. § 2302(f)(2), he did not make findings as to whether the appellant met his burden to prove that his October 2013 disclosures were protected under section 2302(b)(8). The appellant has not specifically addressed the elements of his prima facie case on review, although he generally asserts that he disclosed gross mismanagement and fraud. PFR File, Tab 1 at 8, 14. We find the appellant has met his burden to prove his prima facie case of whistleblower reprisal.

> *The appellant proved that he reasonably believed that his disclosures regarding fleet vehicles and fleet cards evidenced gross mismanagement.*

¶24    The proper test for determining whether an employee had a reasonable belief that his disclosures were protected is whether a disinterested observer with knowledge of the essential facts known to, and readily ascertainable by, the employee could reasonably conclude that the actions evidenced gross mismanagement or one of the other categories of wrongdoing set forth in 5 U.S.C. § 2302(b)(8). *See Mudd v. Department of Veterans Affairs*, 120 M.S.P.R. 365, ¶ 5 (2013). "Gross mismanagement" is more than de minimis wrongdoing or negligence; it means a management action or inaction that creates a substantial risk of significant adverse impact on the agency's ability to accomplish its mission. *Swanson v. General Services Administration*, 110 M.S.P.R. 278, ¶ 11 (2008).

¶25    The agency's mission "is to fulfill President Lincoln's promise, 'To care for him who shall have borne the battle, and for his widow, and his orphan' by

serving and honoring the men and women who are America's Veterans." IAF, Tab 5 at 96. Pursuant to an agency directive, "[i]t is [agency] policy to manage its vehicle fleet in an effective, efficient, and fiscally sound manner in order to support the [agency's] mission." *Id.* The appellant testified, without contradiction, that the agency's Community Care Program used their fleet of 88 vehicles to reach out to the veteran community, including in the effort "to end homelessness." HT at 11 (testimony of the appellant).

¶26 The substance of the appellant's October 10 and October 24, 2013 disclosures was what he viewed as a "vehicle and credit card issue in the Homeless program [which] is in an alarming state of disarray and must be dealt with immediately." IAF, Tab 5 at 62. Specifically, he stated that, based on reports he received from employees assigned to dispatch vehicles assigned to the Community Care Program, the fleet vehicle keys and cards were "stored in a room . . . , [to which] nearly everyone could gain access," vehicle cards were missing, and "[i]t now is apparent that there was a lack of control of these cards and vehicles." IAF, Tab 5 at 62, Tab 8 at 6, 11; HT at 16-19 (testimony of the appellant), 71-75 (testimony of a former Community Care Management Analyst). He further reported that "personnel from [the Program] stated that thirty of the eighty-eight vehicles were unaccounted for, with no idea who had possession of them," and he was "aware of ten separate credit cards that [were] suspected of fraud." IAF, Tab 5 at 63. The appellant's supervisor testified that he viewed the appellant's October 24, 2013 email as a report of gross mismanagement and that he agreed "obviously, something was amiss." HT at 229-30 (testimony of the appellant's supervisor). We find that the appellant reasonably believed that the agency's mismanagement of fleet vehicles created a substantial risk of significant adverse impact on the agency's ability to provide services to care for veterans,

and in particular homeless veterans.[7]  Because providing such services is part of the agency's mission, we find the appellant's disclosures were protected.

>    *The administrative judge properly determined that the appellant proved*
>    *that the agency took personnel actions against him.*

¶27    The administrative judge implicitly found that the appellant's (1) delayed training, (2) changed performance standards, (3) placement on a PIP, and (4) removal were personnel actions as defined by 5 U.S.C. § 2302(a).  IAF, Tab 17 at 6; ID at 14 n.7, 15.  We agree.  The appellant's placement on a PIP and removal are personnel actions.  *See* 5 U.S.C. § 2302(a)(2)(A)(iii), (viii) (defining "personnel action" to include disciplinary actions and performance evaluations); *Gonzales v. Department of Housing & Urban Development*, 64 M.S.P.R. 314, 319 (1994) (finding that placement on a PIP is, by definition, a threatened personnel action, such as a reduction in grade or removal).

¶28    Concerning his delayed training, 5 U.S.C. § 2302(a)(2)(A)(ix) provides that "a decision concerning . . . training" is a personnel action "if the . . . training may reasonably be expected to lead to . . . [a] performance evaluation or other [personnel] action" described in 5 U.S.C. § 2302(a)(2)(A).  There must be, at a minimum, a moderate probability that the training would have resulted in, or avoided, some type of personnel action.  *Simone v. Department of the Treasury*, 105 M.S.P.R. 120, ¶ 9 (2007); *Shivaee v. Department of the Navy*, 74 M.S.P.R. 383, 387 (1997).  Here, that standard is met.

¶29    In March 2014, a Fleet Management Analyst from the agency's Veterans Affairs Central Office offered to provide 2-day on-site training to the appellant and others in May 2014.  IAF, Tab 5 at 72-73.  The training would have given "assistance and oversight of Fleet Management responsibilities, mandates, and ensure policies/procedures are met."  *Id.* at 73.  The appellant wanted to

---

[7] The agency did not dispute below that, under 5 U.S.C. § 2302(b)(8), the appellant's disclosures were protected.  IAF, Tab 24 at 24.

participate because he believed the training would assist the department in meeting fleet management goals and provide him with an opportunity to meet his standards. IAF, Tab 5 at 72; HT at 25-27, 53-54 (testimony of the appellant). The appellant's supervisor denied his request for the training at that time. IAF, Tab 5 at 72. The appellant did eventually receive the training in September 2014, the same month that the agency placed him on a PIP for unacceptable performance pertaining to fleet management, which ultimately led to his removal. HT at 28 (testimony of the appellant), 249-53 (testimony of the appellant's supervisor); IAF, Tab 5 at 16, 103, Tab 6 at 4-15. The appellant's first-level supervisor testified that the appellant "continued to be unsuccessful" after taking the training in September 2014. Nonetheless, we find that at the time the appellant requested the training, it was possible that the training could have improved his performance, which may have made the PIP unnecessary. We find the delay of training in March 2014 was, therefore, a personnel action.

¶30 Regarding the June 2014 change in the appellant's performance standards, "any . . . , significant change in duties, responsibilities, or working conditions" is a personnel action under 5 U.S.C. § 2302(a)(2)(A)(xii). We recently explained that, to amount to a "significant change" under section 2302(a)(2)(A)(xii), an agency action must have a significant impact on the overall nature or quality of an employee's working conditions, responsibilities, or duties. *Skarada v. Department of Veterans Affairs*, 2022 MSPB 17, ¶ 15.

¶31 Here, the appellant's prior performance standards included just one critical element, "Program Administration," which generally required that the appellant monitor resources for proper utilization, ensure satisfactory performance by staff, identify and fulfill staff training needs, and develop appropriate performance standards for staff. IAF, Tab 5 at 78. By contrast, the appellant's updated performance standards included two critical elements, "Motor Vehicle Inventory Control" and "Motor Vehicle Maintenance and Reporting." IAF, Tab 6 at 16-23. The new standards contained more extensive, focused, and specific requirements

pertaining to vehicles, many of which included express deadlines. *Id.* at 20-22; HT at 191-93 (testimony of the appellant's supervisor). In comparing his old and new performance standards, we find that the appellant was subjected to a significant change in duties and responsibilities because the new standards effectively changed his duties from supervising subordinate employees to tracking the location, and ensuring the maintenance, of vehicles.

> *The administrative judge properly determined that the appellant proved contributing factor under the knowledge/timing test.*

¶32     One of the ways to prove that a disclosure was a contributing factor in a personnel action is the knowledge/timing test, in which the appellant may demonstrate that the official taking the personnel action knew of the disclosure, and that the personnel action occurred within 1 to 2 years of the disclosure. *Wilson v. Department of Veterans Affairs*, 2022 MSPB 7, ¶ 41. The administrative judge found that the appellant met this test. ID at 30-31. The agency conceded below that the knowledge prong of the knowledge/timing test was satisfied for each of the alleged personnel actions. IAF, Tab 24 at 24. We agree.

¶33     The appellant made his disclosures in October 2013 directly to his first-level supervisor, who, over the subsequent 15 months, delayed the appellant's training, changed his performance standards, placed him on a PIP, and proposed his removal. IAF, Tab 5 at 16-18, 62-63, 72-73, 103-09, Tab 6 at 4-23; HT at 199 (testimony of appellant's supervisor). The deciding official also had actual knowledge of the appellant's disclosures. The appellant raised his belief that he was the victim of retaliation in his response to the proposed removal, as well as referring to and attaching his October 2013 emails. IAF, Tab 5 at 23-36, 62-63. The deciding official reviewed this response and was aware of the appellant's allegation that the actions leading up to and including his proposed removal were in reprisal for his disclosures. HT at 338-41 (testimony of the deciding official). The agency removed the appellant effective February 4, 2015,

less than 2 years after he made his disclosures.  IAF, Tab 5 at 16.  Thus, the appellant has proven contributing factor.

On remand, the administrative judge must address whether the agency proved by clear and convincing evidence that it would have taken the personnel actions absent the appellant's protected disclosures.

¶34      When, as in this case, an appellant shows by preponderant evidence that he made protected disclosures and that those disclosures were a contributing factor in the decision to take personnel actions, the burden shifts to the agency to prove by clear and convincing evidence that it would have taken the personnel actions in the absence of the whistleblowing.  *Smith v. Department of the Army*, 2022 MSPB 4, ¶¶ 13, 23.  Clear and convincing evidence is that measure or degree of proof that produces in the mind of the trier of fact a firm belief as to the allegations sought to be established.  *Id.*, ¶ 13 n.8; 5 C.F.R. § 1209.4(e).  It is an intentionally high standard of proof and is higher than the "preponderance of the evidence" standard.  *Chambers v. Department of the Interior*, 116 M.S.P.R. 17, ¶ 28 (2011) (citations omitted); 5 C.F.R. § 1209.4(e).

¶35      In determining whether an agency has met this burden, the Board generally considers the following ("*Carr* factors"):   (1) the strength of the agency's evidence in support of its action; (2) the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision; and (3) any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated.  *Soto v. Department of Veterans Affairs*, 2022 MSPB 6, ¶ 11; *see also Carr v. Social Security Administration*, 185 F.3d 1318, 1323 (Fed. Cir. 1999).[8]      The

---

[8] Historically, the Board has been bound by the precedent of the U.S. Court of Appeals for the Federal Circuit on these types of whistleblower issues.  However, pursuant to the All Circuit Review Act (Pub. L. No. 115-195, 132 Stat. 1510), appellants may file petitions for judicial review of Board decisions in whistleblower reprisal cases with any circuit court of appeals of competent jurisdiction.  *See* 5 U.S.C. § 7703(b)(1)(B).

administrative judge previously considered some of these factors when analyzing whether the appellant's disclosures were protected under 5 U.S.C. § 2302(f)(2). ID at 32-52. However, in doing so, he placed the burden of proof on the appellant. ID at 17-18, 26. Because 5 U.S.C. § 2302(f)(2) is inapplicable to this matter and this is a different stage of the proceedings with different burdens of proof, the administrative judge's prior analysis must be reevaluated. We find it appropriate to remand this case because the administrative judge, as the hearing officer, is in the best position to make factual findings and detailed credibility assessments on the *Carr* factors. *See Mastrullo v. Department of Labor*, 123 M.S.P.R. 110, ¶ 27 (2015) (citing this consideration in remanding an IRA appeal for an administrative judge to make a determination as to whether the agency subjected the appellant to a personnel action and, if so, to evaluate the remaining elements of the appellant's whistleblower reprisal claim).

¶36     On remand, the administrative judge should reassess each of the *Carr* factors in light of the findings herein, giving weight to the appellant's first-level supervisor's motive to retaliate, as he testified that "it didn't make [his] day" that he received the letter of counseling for mismanagement of vehicles, and responded in the affirmative to the question of whether he held the appellant partially responsible for the letter. *Id.* at 245 (testimony of the appellant's supervisor). Further, on remand, the administrative judge should consider that the appellant's disclosures also reflected poorly on the appellant's first-level supervisor and the deciding official as representatives of the general institutional interests of the agency, which is sufficient to establish retaliatory motive. *Wilson*, 2022 MSPB 7, ¶ 65; *Smith*, 2022 MSPB 4, ¶¶ 28-29.

Therefore, we must consider these issues with the view that the appellant may seek review of this decision before any appropriate court of appeal.

## ORDER

¶37　　　For the reasons discussed above, we remand this case for further adjudication in accordance with this Opinion and Order.

FOR THE BOARD:

/s/
_____

Jennifer Everling
Acting Clerk of the Board
Washington, D.C.