**UNITED STATES OF AMERICA**
**MERIT SYSTEMS PROTECTION BOARD**
**2023 MSPB 25**

Docket No. DC-1221-21-0292-W-2

**Calvin Wesley Turner, Jr.,**

**Appellant,**

**v.**

**Department of Agriculture,**

**Agency.**

August 30, 2023

Janel Quinn, Esquire, Nicholas Woodfield, Esquire, and R. Scott Oswald, Esquire, Washington, D.C., for the appellant.

Christian E. Pagan, Esquire, and Stephanie Ramjohn Moore, Esquire, Washington, D.C., for the agency.

**BEFORE**

Cathy A. Harris, Vice Chairman
Raymond A. Limon, Member

**OPINION AND ORDER**

¶1 The appellant has filed a petition for review of the initial decision, which denied corrective action in his individual right of action (IRA) appeal. For the reasons discussed below, we GRANT the appellant's petition for review, VACATE the initial decision, and REMAND this matter to the regional office for further adjudication in accordance with this Remand Order.

BACKGROUND

¶2 The appellant was the Director of the National Finance Center (NFC), a component of the Office of the Chief Financial Officer of the U.S. Department of

Agriculture (USDA). *Turner v. Department of Agriculture*, MSPB Docket No. DC-1221-21-0292-W-2, Appeal File (W-2 AF), Tab 8 at 7, 14.[1] NFC is a nonappropriated fund (NAF) instrumentality, meaning that its budget is solely derived from the fees it charges its customers for the services it provides. W-2 AF, Hearing Transcript, Sept. 27, 2021 (HT 1), at 16 (testimony of the appellant). Specifically, NFC provides human resource management and administrative services, such as payroll, billing, collections, recordkeeping, and financial information management, to other components of USDA and other Federal entities. W-2 AF, Tab 8 at 8. NFC and its customers enter into contracts, known as Interagency Agreements (IAs), which set forth the anticipated cost of NFC's services based on an estimation of direct costs attributable to the individual customer, as well as indirect costs, i.e., administrative or overhead expenses, which are distributed across all NFC customers using a cost allocation methodology.[2] HT 1 at 16-19 (testimony of the appellant).

¶3      In or around January 2017, NFC provided an IA to the Associate Chief Financial Officer (CFO) for USDA's Financial Management Services (FMS), which estimated the cost of NFC's administrative services for FMS at $10.2 million. *Id.* at 21-22, 31 (testimony of the appellant). The proposed FMS IA encompassed the same level of administrative services that NFC had provided to FMS during the previous fiscal year (FY), i.e., FY16, which had cost

---

[1] The appellant resigned from his position on January 29, 2021. W-2 AF, Tab 8 at 14-17. There is no evidence that the appellant raised his resignation to the Office of Special Counsel. Furthermore, his resignation is not identified as a personnel action at issue in this appeal in the administrative judge's prehearing order, and, despite being afforded the opportunity, the appellant did not raise any objection to the order's characterization of his claim. W-2 AF, Tab 11. The appellant also did not object on review to the administrative judge not addressing his resignation in her initial decision. Thus, we do not address his resignation.

[2] The background regarding the agency's operations is largely drawn from the appellant's hearing testimony. The agency does not contest this testimony.

$8.7 million, but for which FMS was only charged $5.4 million. *Id.* at 150-52 (testimony of the appellant); W-2 AF, Tab 10 at 40-41. FMS objected to the $10.2 million IA, asserting that the rates were too high, and stating that it only had approximately $5.9 million available to pay for NFC's services in 2017. *Id.* at 21-22 (testimony of the appellant). Therefore, the appellant worked with his supervisor, the Acting Deputy CFO at the time, as well as the Associate CFO for FMS, to determine what services could be pared back so that the IA's cost could be lowered. *Id.* at 23-24, 26-29 (testimony of the appellant).

¶4    However, on April 19, 2017, NFC's CFO emailed the appellant, requesting that he sign an IA for FMS for FY17, which had an estimated cost of $5.9 million, with no reduction in services. *Id.* at 31-32 (testimony of the appellant); W-2 AF, Tab 10 at 74-75. The appellant forwarded the email to his supervisor, explaining his concerns that, by reducing the overall cost but not the services provided to FMS, NFC would not be able to recover the actual cost of its services, and "[NFC would be] subsidizing FMS operations with a combination of 4% profit and other customers' money."[3]   HT 1 at 32-33 (testimony of the appellant); W-2 AF, Tab 10 at 74.

¶5    The appellant continued to express concerns about the $5.9 million FMS IA, requesting that his supervisor confirm that the parties agreed that $5.9 million was only a portion of the $10.2 million that NFC's services would cost, and that NFC would provide FMS with a modified IA for the remaining balance. W-2 AF, Tab 10 at 73-74. His supervisor agreed that the $5.9 million was only a part of the total cost of services, but claimed that NFC should recalculate its cost methodology to determine the remaining balance. *Id.* at 73. Nevertheless, she still urged the appellant to sign the IA, stating, among other things, that "[w]e

---

[3] The appellant explained in his testimony that NFC is allowed to retain a 4% profit, which is intended to be used for capital investments. HT 1 at 19-20 (testimony of the appellant).

need to move past this barrier, so that we can get to the next one. If you do not sign [the IA], there is no executable agreement or funds for [NFC] to repay [its] capital expenses." *Id.* at 72. The appellant also emailed the NFC's Working Capital Fund Director about his concerns, stating that signing the $5.9 million FMS IA was "not only unethical and illegal, but it [would] further cripple NFC's financial position," and that he believed he was being "pressured to do something illegal."[4] W-2 AF, Tab 4 at 10-13.

¶6 Several years later, on October 19, 2020, the appellant filed a complaint with the Office of Special Counsel (OSC) alleging that the agency retaliated against him for his disclosures regarding the $5.9 million FMS IA by taking certain personnel actions, including: (1) revoking his authority to sign IAs over $5 million in September 2017; (2) lowering his rating to exceeds fully successful[5] in October 2017; (3) issuing him a letter of counseling in October 2019; (4) lowering his rating to exceeds fully successful in October 2019; (5) subjecting him to a random drug test in November 2019; (6) placing him on administrative leave in June 2020; and (7) issuing him a letter of reprimand in July 2020. *Turner v. Department of Agriculture*, MSPB Docket No. DC-1221-21-0292-W-1, Initial Appeal File (IAF), Tab 1 at 7, Tab 12 at 10-39. After OSC notified the appellant that it had concluded its investigation, the appellant filed an IRA appeal with the Board, asserting the same claims he raised before OSC. IAF, Tab 1. The

---

[4] Eventually, in August 2017, the appellant signed a $6.3 million FMS IA, which contained modified language setting forth the exact services provided to FMS, when those services would terminate, and stating that anything outside of those services would be subject to a new agreement. HT 1 at 59-61, 179-80 (testimony of the appellant).

[5] Although the appellant alleges that he received a "superior" rating on his FY17 and FY19 performance evaluations, IAF, Tab 6 at 7-9, 11-12, the agency's performance management system does not have a "superior" rating, but instead, the second from the top rating is an "exceeds fully successful" rating, W-2 AF, Tab 4 at 50. We will use the terminology reflected in the agency's performance management system.

administrative judge issued a jurisdictional order in which she apprised the appellant of the applicable law and burden of proof requirements for an IRA appeal and ordered him to submit evidence and argument establishing Board jurisdiction. IAF, Tab 3. The appellant responded to the order, IAF, Tabs 6-12, and the administrative judge found that the appellant exhausted his administrative remedies and made a nonfrivolous allegation of jurisdiction, IAF, Tab 26.

¶7        After holding a hearing, the administrative judge issued an initial decision denying the appellant's request for corrective action. W-2 AF, Tab 23, Initial Decision (ID). Specifically, the administrative judge found that the appellant failed to establish that he held a reasonable belief that his disclosures about the $5.9 million FMS IA evidenced a violation of law, rule, or regulation. ID at 10-12. Thus, she found that the appellant failed to establish by preponderant evidence that he made a protected disclosure and denied his request for corrective action.[6] ID at 12-13.

¶8        The appellant has filed a petition for review, arguing that his disclosures regarding the $5.9 million FMS IA were protected because he held a reasonable belief that they evidenced a violation of the Antideficiency Act, which governs the expenditure of Federal funds. Petition for Review (PFR) File, Tab 1 at 6-27. The appellant also asserts that the reasonableness of his belief is supported by the

---

[6] The appellant also alleged to OSC and before the administrative judge that he made protected disclosures when, from August 2017 through 2019, he raised concerns that NFC's computer systems were not secure and that the agency needed to fill critical information technology positions. IAF, Tab 1 at 22, Tab 26 at 1-2. However, the appellant seemingly abandoned this disclosure prior to the hearing, as he did not object to the prehearing order which did not include the disclosure, the disclosure is not addressed in the initial decision, and the appellant has not raised it as an issue on review. *See Thurman v. U.S. Postal Service*, 2022 MSPB 21, ¶ 18 (summarizing factors to be considered when determining whether an appellant waived or abandoned an affirmative defense, to include the degree to which the appellant pursued the defense after raising it, and whether the appellant objected to the defense's exclusion from the summary of issues to be decided). Accordingly, we do not address it.

testimony of three witnesses, which the administrative judge failed to consider. *Id.* at 10-18, 26-27. The agency responded in opposition to the appellant's petition for review, and the appellant replied to the agency's response. PFR File, Tabs 3-4.

## ANALYSIS

### NAF employees of non-military instrumentalities meet the definition of employee under 5 U.S.C. § 2105(a) and therefore can file IRA appeals.

¶9    First, because we are presented with the unique situation of an NAF employee who is not employed by a military exchange or instrumentality, we take this opportunity to clarify that NAF employees of non-military instrumentalities may file IRA appeals. The Board's jurisdiction is not plenary; it is limited to those matters over which it has been given jurisdiction by law, rule, or regulation. *Maddox v. Merit Systems Protection Board*, 759 F.2d 9, 10 (Fed. Cir. 1985). The Board, as well as the U.S. Court of Appeals for the Federal Circuit (Federal Circuit), broadly have held that NAF employees have no right to file IRA appeals with the Board. *See Clark v. Merit Systems Protection Board*, 361 F.3d 647, 650-51 (Fed. Cir. 2004) (finding that employees serving in NAF positions have no right to file IRA appeals); *DeGrella v. Department of the Air Force*, 2022 MSPB 44, ¶¶ 9-15 (same); *Clark v. Army and Air Force Exchange Service*, 57 M.S.P.R. 43, 44-46 (1993) (same). However, the cases cited address the Board's jurisdiction over IRA appeals filed by NAF employees of military exchanges or instrumentalities. It does not appear that the Board has ever made a pronouncement in a precedential decision as to its jurisdiction when, as here, the NAF employee does not work for a military exchange or instrumentality. Accordingly, although neither party disputes the Board's jurisdiction, we take the opportunity to address the basis of the jurisdiction here.

¶10    The right to file an IRA appeal with the Board derives from 5 U.S.C. § 1221(a), which provides a right to seek corrective action from the Board to "an employee, former employee, or applicant for employment." *Maloney v. Executive*

*Office of the President*, 2022 MSPB 26, ¶ 33. To be an employee under section 1221(a), an individual must meet the definition of employee under 5 U.S.C. § 2105. *Id.* Under 5 U.S.C. § 2105(a), an "employee" is an officer and an individual: (1) who is appointed in the civil service by one of the types of individuals enumerated in the statute acting in their official capacity; (2) engaged in the performance of a Federal function under authority of law or an Executive act; and (3) subject to the supervision of an authorized official while engaged in the performance of the duties of his position. *Id.*

¶11    As relevant to our discussion here, section 2105 also excludes certain categories of individuals from the definition of employee. For instance, pursuant to 5 U.S.C. § 2105(c), an NAF employee of "the Army and Air Force Exchange Service, Navy Ships Stores Program, Navy exchanges, Marine Corps exchanges, Coast Guard exchanges, and other instrumentalities of the United States under the jurisdiction of the armed forces conducted for the comfort, pleasure, contentment, and mental and physical improvement of personnel of the armed forces," with certain exceptions not applicable here, are excluded from the definition of "employee" for the purpose of laws administered by the Office of Personnel Management.[7] The Board and the Federal Circuit have held that, for the purpose of laws administered by the Office of Personnel Management, NAF employees of military instrumentalities cannot file IRA appeals because they do not meet the definition of employee under 5 U.S.C. § 2105. *Clark*, 361 F.3d at 650-51; *DeGrella*, 2022 MSPB 44, ¶¶ 9-15; *Clark*, 57 M.S.P.R. at 44-46. However, when, as here, an appellant is an NAF employee of a non-military instrumentality, the exclusion set forth in 5 U.S.C. § 2105(c) does not apply. Thus, the Board has

---

[7] The Board and the Federal Circuit have found that the statutory provisions that allow an employee to seek corrective action from the Board by filing an IRA appeal, 5 U.S.C. §§ 1214(a)(3) and 1221(a), make them applicable to "employees" as defined in 5 U.S.C. § 2105. *DeGrella*, 2022 MSPB 44, ¶¶ 9-15; *Clark*, 57 M.S.P.R. at 44-46; *see Clark*, 361 F.3d at 650-51.

jurisdiction over appeals filed by NAF employees of non-military instrumentalities.

The appellant established that he held a reasonable belief that his disclosures evidenced a violation of law.

¶12    Under the Whistleblower Protection Enhancement Act (WPEA), at the merits stage of the appeal, the appellant must prove by preponderant evidence that he made a protected disclosure under 5 U.S.C. § 2302(b)(8), or engaged in an activity protected by 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D), and that such disclosure or activity was a contributing factor in an agency's personnel action. *Smith v. Department of the Army*, 2022 MSPB 4, ¶ 13.  If the appellant meets that burden, the agency is given an opportunity to prove by clear and convincing evidence that it would have taken the same personnel action absent the protected disclosure or activity.  *Id.*; *see* 5 U.S.C. § 1221(e)(1)-(2).

¶13    The administrative judge found that the appellant did not hold a reasonable belief that his disclosures regarding the $5.9 million FMS IA evidenced a violation of law, rule, or regulation, finding that:  (1) NFC charges were not established by law and could be changed; (2) the appellant and his supervisor worked together to ensure that NFC would fully recover its costs from FMS; and (3) IAs were part of a negotiation process that "inherently involve[d] estimating costs" which could be modified later.  ID at 10-12.  On review, the appellant disputes these findings, contending that his disclosures about the $5.9 million FMS IA evidenced a violation of law, rule, or regulation,[8] pointing to the Antideficiency Act as an example of such a law.  PFR File, Tab 1 at 6-19, 23-28.

_____

[8] Although the subheading in the appellant's petition for review states that his disclosures about the $5.9 million FMS IA evidenced a substantial and specific danger to public safety, both on review and before the administrative judge, the appellant has only argued that his disclosures evidenced a violation of law, rule, or regulation.  PFR File, Tab 1 at 23-26; W-2 AF, Tab 3 at 13-14.  As this appears to be a typographical error, we do not address it further.

¶14      A protected disclosure is a disclosure that an appellant reasonably believes evidences a violation of any law, rule, or regulation, gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety.  5 U.S.C. § 2302(b)(8)(A); *Smith*, 2022 MSPB 4, ¶ 14.  A reasonable belief exists if a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the appellant could reasonably conclude that the actions of the Government evidence one of the categories of wrongdoing listed in section 2302(b)(8)(A).   *Smith*, 2022 MSPB 4, ¶ 14.   The appellant need not prove that the matter disclosed actually established one of the types of wrongdoing listed under section 2302(b)(8)(A); rather, he must only show that the matter disclosed was one that a reasonable person in his position would believe evidenced any of the situations specified in section 2302(b)(8)(A).  *Id.*  Furthermore, the Board has found that an employee need not wait until an actual violation of law occurs for his disclosure to be protected under whistleblower protection statutes.  *Covington v. Department of the Interior*, 2023 MSPB 5, ¶ 38.[9]

¶15      We find that a disinterested observer could reasonably conclude that the appellant's disclosures regarding the $5.9 million FMS IA evidenced a violation of a law, rule, or regulation.  While it is expected that IAs include only an estimate of the cost of services, which can be modified if needed, the initial estimation should nevertheless be based on actual projections of the anticipated

---

[9] When, as here, a disclosure concerns a potential violation of law, as opposed to an event that has already taken place, an appellant must prove that he reasonably believed the potential wrongdoing was real and immediate.  *Covington*, 2023 MSPB 5, ¶ 38.  In order to strike a balance between preventing Government wrongdoing on the one hand and encouraging "healthy and normal" discussions of "possible courses of action" that may avoid such wrongdoing on the other hand, the determination of whether the disclosure is protected "depends on the facts."  *Id.* (quoting *Reid v. Merit Systems Protection Board*, 508 F.3d 674, 678 (Fed. Cir. 2007)). Under the circumstances present here, we find that the potential for wrongdoing was real and immediate.

cost of services. Here, NFC knew that $5.9 million was not representative of the actual cost of the services being provided to FMS when it requested the appellant sign the IA. HT 1 at 20-23 (testimony of the appellant), 270 (testimony of the appellant's supervisor); W-2 AF, Tab 4 at 10-13, Tab 10 at 72-74. Thus, it appears that NFC was capitulating to what FMS was willing or able to pay for those services. HT 1 at 21-22 (testimony of the appellant); W-2 AF, Tab 4 at 10-13.

¶16 The appellant's concerns are further supported by the fact that, according to the appellant, FMS had a history of not paying fully for the actual cost of NFC's services. For instance, according to the appellant, in FY16, FMS only paid $5.4 million for administrative services which, in reality, cost $8.7 million.[10] HT 1 at 150-51 (testimony of the appellant); W-2 AF, Tab 10 at 40-41. Additionally, the appellant testified that, although FMS had stated that it would remove certain services, i.e., human resource servicing, from NFC's purview to reduce the cost, FMS never did so. HT 1 at 34-36 (testimony of the appellant). Therefore, according to the appellant, NFC continued to provide the same level of service even though FMS was unwilling to compensate NFC for that level of service. *Id.* at 21-23, 34-36 (testimony of the appellant).

¶17 The appellant has testified without dispute that NFC is a business center, which derives its budget solely from the fees it charges to its customers. HT 1 at 16 (testimony of the appellant). Using those fees, NFC must cover its own administrative and overhead expenses, and ideally obtain up to a 4% profit margin, which it can then use for capital investments. *Id.* at 16-20 (testimony of the appellant). Should FMS not pay the actual cost of NFC's services, then NFC would have to subsidize FMS's failure either by (1) reallocating funds from other

---

[10] The appellant was not Director of NFC at the time the FY16 FMS IA was negotiated, and he testified that he did not know how FMS was able to pay less than $8.7 million. HT 1 at 147.

Federal agency customers (thus potentially increasing the cost of services for other agencies); (2) by covering the loss with its own profit margin; or (3) a combination thereof. *Id.* at 32-33, 41-42 (testimony of the appellant); IAF, Tab 6 at 37-38; W-2 AF, Tab 10 at 74.

¶18        The appellant claimed that allowing FMS to only pay $5.9 million would be illegal because other customers, which were funded by appropriated funds, would have to pay more than services to them cost in order to subsidize the discount to FMS.  IAF, Tab 6 at 37-38; W-2 AF, Tab 10 at 74; HT 1 at 32-33, 41-42 (testimony of the appellant).  Three witnesses, all of whom had knowledge of the FMS IA negotiation process, testified, among other things, that they would not have signed an IA under similar circumstances because it would violate the Antideficiency Act.  Hearing Transcript, Sept. 28, 2021, at 11-12, 32, 35 (testimony of the agency's former Deputy Director of the Government Employees Services Division), 80-82, 90-91 (testimony of the agency's former Director of Information Technology Services Division), 144-45 (testimony of the agency's Acting Director of NFC).  Although not dispositive, the fact that other knowledgeable agency employees and former employees shared the appellant's concerns lends some support to the reasonableness of his belief. *See Lachance v. White*, 174 F.3d 1378, 1381 (Fed. Cir. 1999) (explaining the fact that other similarly situated employees shared the same belief "may be of some relevance" in determining whether an appellant's belief was reasonable).  Furthermore, on its face, it is not unreasonable to believe charging a customer $5.9 million for services worth $10.2 million, which would cause NFC to experience financial strain and/or lead to overcharging other Federal clients, violates a law, rule, or regulation. *See* HT 1 at 150-52 (testimony of the appellant); W-2 AF, Tab 10 at 40-41.  Accordingly, we find that the appellant proved by preponderant evidence that his $5.9 million FMS IA disclosures were protected because he held

a reasonable belief that his disclosures evidenced a violation of law, rule, or regulation.[11]

<u>The appeal must be remanded for further proceedings.</u>

¶19    The administrative judge made no findings beyond finding that the appellant did not prove that he made a protected disclosure. Although the record is well developed, the administrative judge, as the hearing officer, is in the best position to make factual findings and credibility determinations. *Salazar v. Department of Veterans Affairs*, 2022 MSPB 42, ¶ 35. Therefore, we find it appropriate to remand this matter for the administrative judge to determine whether the appellant established that his protected disclosures were a contributing factor in the identified personnel actions,[12] and, if so, whether the agency proved by clear and convincing evidence that it would have taken the same actions in the absence of the protected disclosures.[13]    5 U.S.C. § 1221(e)(1)-(2).

---

[11] One part of the whistleblower protection statutory scheme makes it a prohibited personnel practice to take an action against an employee for "refusing to obey an order that would require the individual to violate a law, rule, or regulation." 5 U.S.C. § 2302(b)(9)(D); *see Fisher v. Department of the Interior*, 2023 MSPB 11, ¶¶ 11-12. Although the events set forth by the appellant could implicate this provision, the appellant, who has been represented by counsel throughout these proceedings, has not argued that this provision applies. Thus, we need not consider it.

[12] The administrative judge should also consider whether the fifth accepted personnel action, selection for random drug testing, is, in fact, a personnel action under 5 U.S.C. § 2302(a)(2)(A)(xii), i.e., a significant change in duties, responsibilities, or working conditions. W-2 AF, Tab 11 at 4.

[13] An issue that the administrative judge may need to address on remand is whether the appellant's disclosures were made during the normal course of his duties. In a prior version of the statute enacted in the WPEA, 5 U.S.C. § 2302(f)(2) provided that disclosures "made during the course of duties of an employee" are protected if the appellant shows that the agency took a personnel action "in reprisal for" the disclosures. *Salazar*, 2022 MSPB 42, ¶ 10 (citing 5 U.S.C. § 2302(f)(2)). The National Defense Authorization Act for Fiscal Year 2018 (2018 NDAA) amended section 2302(f)(2), adding language that the provision applies to employees whose "principal job function . . . is to regularly investigate and disclose wrongdoing." Pub.

ORDER

¶20    For the reasons discussed above, we remand this case to the administrative judge for further adjudication in accordance with this Remand Order.

FOR THE BOARD:

/s/
_____
Jennifer Everling
Acting Clerk of the Board
Washington, D.C.

---

L. No. 115-91, § 1097(c)(1)(B)(ii), 131 Stat. 1283, 1618 (2017).  As the Board held in *Salazar*, 2022 MSPB 42, ¶¶ 15-21, the 2018 NDAA clarified the intent of 5 U.S.C. § 2302(f)(2), and therefore, the language of that subsection, as amended by the 2018 NDAA, applies retroactively to all pending cases, even if the events at issued occurred before the 2018 NDAA was enacted.