# UNITED STATES OF AMERICA
## MERIT SYSTEMS PROTECTION BOARD

ROBERT M. HARRY,
    Appellant,

   v.

DEPARTMENT OF THE INTERIOR,
    Agency.

DOCKET NUMBER
DE-1221-20-0383-W-1

DATE: August 30, 2023

# THIS ORDER IS NONPRECEDENTIAL[1]

<u>Sterling Deramus</u>, Esquire, Birmingham, Alabama, for the appellant.

<u>Ryan W. Burton</u>, Lakewood, Colorado, for the agency.

**BEFORE**

Cathy A. Harris, Vice Chairman
Raymond A. Limon, Member

**REMAND ORDER**

The appellant has filed a petition for review of the initial decision, which dismissed his individual right of action (IRA) appeal based on the doctrine of collateral estoppel, in part, and for lack of jurisdiction as to the remaining claims. For the reasons discussed below, we GRANT the appellant's petition for review,

---

[1] A nonprecedential order is one that the Board has determined does not add significantly to the body of MSPB case law. Parties may cite nonprecedential orders, but such orders have no precedential value; the Board and administrative judges are not required to follow or distinguish them in any future decisions. In contrast, a precedential decision issued as an Opinion and Order has been identified by the Board as significantly contributing to the Board's case law. *See* 5 C.F.R. § 1201.117(c).

VACATE the portion of the initial decision dismissing the appeal for lack of jurisdiction and REMAND the case to the Denver Field Office for further adjudication in accordance with this Remand Order. We AFFIRM the administrative judge's findings on the collateral estoppel issue.

## BACKGROUND

¶2 Effective February 21, 2016, the appellant was hired as a GS-12 Mining Engineer with the Bureau of Land Management (BLM) in Billings, Montana. *Harry v. Department of the Interior*, MSPB Docket No. DE-1221-20-0383-W-1, Initial Appeal File (IAF), Tab 1 at 1, Tab 8 at 4. His appointment was in the competitive service and was subject to completion of a 1-year probationary period. *See Harry v. Department of the Interior*, MSPB Docket No. DE-315H-17-0233-I-1, Initial Appeal File, (0233 IAF), Tab 6 at 25. On or around February 17, 2017, the appellant was told that he would be terminated from his position during his probationary period. IAF, Tab 8 at 11. That same day, the appellant signed a statement agreeing to resign from his position, effective February 24, 2017, in exchange for the agency agreeing to do the following: refrain from issuing a notice of decision to terminate; recognizing that the appellant was an "employee" as defined under 5 U.S.C. chapter 75; providing the appellant with a letter of recommendation; and leaving the "Remarks" section blank on the Standard Form (SF) 52 Request for Personnel Action memorializing the appellant's resignation. *Id.* at 11; *see* 0233 IAF, Tab 6 at 20-24.

¶3 On March 21, 2017, the appellant filed an appeal with the Board alleging that his resignation was involuntary. 0233 IAF, Tab 1 at 2. After considering the parties' jurisdictional pleadings, the administrative judge issued an initial decision dismissing that appeal for lack of jurisdiction. 0233 IAF, Tab 15, Initial Decision (0233 ID) at 1, 8. In dismissing this prior appeal for lack jurisdiction, the administrative judge concluded that the agency was entitled to rely on the appellant's statement agreeing to resign from his position and therefore had a

valid reason for denying his request to withdraw his resignation, and that the appellant otherwise failed to make a nonfrivolous allegation that his resignation was the product of misinformation, deception, or coercion by the agency. *Id.* at 4-8. To the extent the appellant was alleging that his involuntary resignation was the result of whistleblowing activity, the administrative judge noted that where allegations of reprisal for whistleblowing are made in connection with a claim of an involuntary action, such claims are addressed insofar as they relate to the issue of voluntariness. *Id.* at 7 n.5; *see* 0233 IAF, Tab 11 at 1, 40; Tab 14 at 4, 15. The administrative judge further noted that if the appellant wished to pursue an IRA appeal, he must first exhaust his administrative remedies with the Office of Special Counsel (OSC) for such a claim. 0233 ID at 8 n.6. The appellant did not file a petition for review in the prior appeal and the decision became final on June 20, 2017. *See id.* at 8.

¶4        On August 27, 2020, the appellant filed the instant IRA appeal alleging that the agency retaliated against him due to his protected disclosures or activities under 5 U.S.C. § 2302(b), when it removed him and refused to allow him to withdraw his resignation. IAF, Tab 1 at 7. With his appeal, the appellant provided a June 25, 2020 close-out letter from OSC, wherein OSC indicated that it was closing its investigation into his allegations that he was harassed, threatened with termination, and forced to resign in retaliation for making protected disclosures. *Id.* at 26. The appellant requested a hearing on the matter. *Id.* at 2.

¶5        In a scheduling order, the administrative judge noted that there appeared to be some overlap between the appellant's prior appeal challenging his resignation as involuntary and the instant IRA appeal, noted that the appellant may have elected to pursue his whistleblower retaliation claims in the prior involuntary resignation appeal, and ordered him to file evidence and argument explaining why his appeal should not be dismissed on the grounds that his prior Board appeal constituted a binding election of remedies regarding his whistleblower retaliation

claims.  IAF, Tab 4 at 1-2.  The administrative judge subsequently issued a second order instructing the parties to also address the question of whether the appeal should be dismissed for lack of jurisdiction on the basis that the appellant was collaterally estopped from re-raising his whistleblower retaliation claim in the instant appeal.  IAF, Tab 7.

¶6      After an initial round of briefing on the relevant issues, *see* IAF, Tabs 8, 13-14, and a subsequent round of briefing on the jurisdictional question, *see* IAF, Tabs 15-17, without holding the appellant's requested hearing, the administrative judge issued an initial decision dismissing the appeal on basis of collateral estoppel with respect to some of the appellant's claims, and for lack of jurisdiction as to the appellant's remaining claims.  IAF, Tab 20, Initial Decision (ID) at 1, 13.  Regarding the issue of collateral estoppel, the administrative judge determined that the appellant had previously challenged three of the four personnel actions in his prior Board appeal, and thus was estopped from re-raising them in the instant IRA appeal.  ID at 5-9.

¶7      With respect to the remaining claims, the administrative judge determined that the appellant nonfrivolously alleged that the final challenged personnel action, concerning his claim that the agency altered his performance plan by setting impossible and unobtainable deadlines, could constitute a significant change in duties, responsibilities, or working conditions under 5 U.S.C. § 2302(a)(2)(A)(xii).[2]  ID at 9.  Nevertheless, the administrative judge determined that the appellant had failed to identify any protected disclosures that prompted this purportedly retaliatory personnel action.  ID at 10-13.  Specifically, he concluded that four of the identified disclosures were not protected because they

---

[2] In so doing, the administrative judge incorrectly identified section 2302(a)(2)(A)(xi) as the operative provision, relying on a previous version of the relevant statutory language.  *See* ID at 9 n.8.  The statute was subsequently amended with the addition of a new subsection 2302(a)(2)(A)(xi), and the subsections were renumbered.  *See* 5 U.S.C. § 2302(a)(2)(A)(xii).

only addressed wrongdoing by a private company, as opposed to wrongdoing by the Government.  ID at 10-11; *see* ID at 6.  Regarding the fifth and final disclosure, the administrative judge determined that the appellant's disclosure to the agency's Human Resources (HR) Director of a "hostile work environment" and a "deteriorating relationship" with his Branch Chief constituted only vague and nonspecific allegations of wrongdoing or general complaints about his relationship with his supervisor, and thus did not rise to the level of a nonfrivolous allegation of a disclosure of the types of wrongdoing described in section 23020(b)(8).  ID at 11-13.  Consequently, the administrative judge determined that the appellant failed to meet his burden of making a nonfrivolous allegation that he had made a protected disclosure under 5 U.S.C. § 2302(b)(8), and therefore failed to establish Board jurisdiction over his IRA appeal.  ID at 13.

¶8        The appellant has filed a petition for review challenging the administrative judge's jurisdictional findings.  Petition for Review (PFR) File, Tab 1.  The agency filed a response to the appellant's petition for review, and the appellant has not filed a reply.  PFR File, Tab 3.

## DISCUSSION OF ARGUMENTS ON REVIEW

¶9        On review, the appellant argues that the administrative judge erred by dismissing Personnel Actions 2, 3, and 4 on the basis that he was collaterally estopped from relitigating those issues because they were litigated in his prior appeal.  PFR File, Tab 1 at 4-6; *see* ID at 5.  The appellant argues that the administrative judge incorrectly applied preclusive effect to these claims despite acknowledging that the appellant had not exhausted his administrative remedies with OSC prior to raising his whistleblower retaliation claims in the initial decision in the prior appeal.  PFR File, Tab 1 at 4-5; *see* 0233 ID at 7-8.  Consequently, he argues that the initial decision in the prior appeal was not one rendered "by a forum with competent jurisdiction" with respect to his claims, and that he was entitled to cure the deficiency with respect to these claims by

exhausting his administrative remedies with OSC and filing a Board IRA appeal, as he did in the instant appeal. PFR File, Tab 1 at 5-6.

¶10 Alternatively, the appellant argues that only Personnel Actions 3 and 4, which concerned his involuntary resignation and the agency's refusal to allow him to withdraw his resignation, respectively, were addressed in his prior appeal. PFR File, Tab 1 at 6; *see* ID at 5. He argues that Personnel Action 2, which concerned his threatened termination, was mentioned in the prior appeal, but the issue was not analyzed by the administrative judge in the initial decision in the prior appeal so he should not be collaterally estopped from litigating that issue in his current IRA appeal. PFR File, Tab 1 at 6; *see* ID at 5.

¶11 Finally, the appellant argues that the administrative judge erred in concluding that he failed to nonfrivolously allege that he made any protected disclosures because four of the disclosures concerned wrongdoing by a private company as opposed to wrongdoing by the Government, and thus were not protected under section 2302(b)(8). PFR File, Tab 1 at 6-9. He argues that nothing in the language of the Civil Service Reform Act of 1978 limits protected disclosures of wrongdoing to only those acts committed by Government actors, and instead that the Act contemplates within its coverage wrongdoing by nongovernmental actors such as contractors and other private entities. *Id.* at 7-8. He also asserts that the Board case the administrative judge relied on to support his finding that section 2302(b)(8) protects only disclosures of wrongdoing by the Government is inapposite and does not support the stated proposition. *Id.* at 8-9.

The appellant is collaterally estopped from relitigating some of his claims in the instant appeal.

¶12 Under the doctrine of collateral estoppel, or issue preclusion, once an adjudicatory body has decided a factual or legal issue necessary to its judgment, that decision may preclude relitigation of the issue in a case concerning a different cause of action involving a party to the initial case. *Hau v. Department of Homeland Security*, 123 M.S.P.R. 620, ¶ 13 (2016), *aff'd sub nom. Bryant v.*

*Merit Systems Protection Board*, [878 F.3d 1320](url) (Fed. Cir. 2017). Collateral estoppel is applicable when the following conditions are met: (1) the issue is identical to that involved in the prior action; (2) the issue was actually litigated in the prior action; (3) the determination of the issue in the prior action was necessary to the resulting judgment; and (4) the party against whom issue preclusion is sought had a full and fair opportunity to litigate the issue in the prior action, either as a party to the earlier action or as one whose interests were otherwise fully represented in that action. *Id.* Before a party can invoke collateral estoppel, the legal matter raised in the subsequent proceeding must involve the same set of events or documents and the same "bundle of legal principles" that contributed to the rendering of the first judgment. *Tanner v. U.S. Postal Service*, [94 M.S.P.R. 417](url), ¶ 11 (2003). In determining whether an issue is identical for collateral estoppel purposes, differences precluding the application of collateral estoppel may be in facts, subject matter, periods of time, case law, statutes, procedural protections, notions of public interest, or qualifications of tribunals. *Id.* The Board has also held that collateral estoppel may bar a party from relitigating an issue in a second action even when the prior appeal was dismissed for lack of jurisdiction. *See, e.g.*, *Coats v. U.S. Postal Service*, [111 M.S.P.R. 268](url), ¶ 8 (2009); *Noble v. U.S. Postal Service*, [93 M.S.P.R. 693](url), ¶ 8 (2003).

¶13    In concluding that the appellant was collaterally estopped from re-raising three of the challenged personnel actions that made up a part of his whistleblower retaliation claim in his prior appeal, the administrative judge determined the following: (1) the appellant had raised the issue of his February 2017 proposed termination, his February 24, 2017 involuntary resignation, and the agency's February 23, 2017 refusal to allow him to withdraw his resignation in his prior Board appeal; (2) these issues were actually litigated in the prior appeal; (3) the determination concerning these issues was necessary to the resulting judgment in that prior appeal, and (4) the appellant had a full and fair opportunity to litigate

these issues in the prior appeal.  ID at 8-9.  Consequently, he determined that the criteria for application of collateral estoppel were met with respect to these claims.  ID at 9 (citing *McNeil v. Department of Defense*, 100 M.S.P.R. 146, ¶ 15 (2005); *Peartree v. U.S. Postal Service*, 66 M.S.P.R. 332, 336–37 (1995)).

¶14      We agree.  Regarding the first element of the test described in *Hau*, it is undisputed that the dispositive issue in the appellant's prior appeal concerned the voluntariness of his February 17, 2017 decision to resign from his position, effective February 24, 2017.  0233 ID at 5-8.  As a part of analyzing the voluntariness of the appellant's decision to resign, the administrative judge considered the effect "the anticipated adverse action" (that is, the appellant's proposed termination) may have had on his decision to resign, but nevertheless concluded that choosing between the unpleasant alternatives of resigning or facing the potential pending action, did not render his decision to resign involuntary.  0233 ID at 6-8.  The administrative judge also considered what effect, if any, the agency's refusal to allow him to withdraw his agreement to resign may have had on the voluntariness of his resignation, but concluded that because the appellant had agreed to resign as a part of a valid settlement agreement, the agency was within its rights to refuse to accept his withdrawal request, and thus the refusal also could not have had an effect on the voluntariness of the appellant's decision to resign.  0233 ID at 4-5.

¶15      Additionally, the administrative judge specifically considered each of these allegations in the context of assessing the voluntariness of the appellant's decision to resign, so each of these issues was also actually litigated in the prior appeal, and a determination as to these issues was necessary to the resulting judgment, fulfilling the second and third elements of the test.  *Hau*, 123 M.S.P.R. 620, ¶ 13; *see* ID at 6-8.  Finally, although the appellant appeared pro se in his prior Board appeal, he submitted a number of pleadings on his own behalf and otherwise had a full and fair opportunity to litigate the jurisdictional issue in the earlier appeal, fulfilling the final element of the test.  *See* 0233 IAF, Tabs 1, 4,

11-12, 14; *McNeil*, 100 M.S.P.R. 146, ¶¶ 13-15 (noting that the fourth element of collateral estoppel does not require that the appellant have been represented in the earlier action, but instead requires that the appellant had a full and fair opportunity to litigate the issue); *Fisher v. Department of Defense*, 64 M.S.P.R. 509, 515 (1994) (same).

¶16     We also give no credence to the appellant's argument on review that he should not be collaterally estopped from re-raising his whistleblower retaliation claims in the instant appeal because pro se litigants, like the appellant was in his prior appeal, regularly prematurely file IRA appeals before exhausting their administrative remedies with OSC, and in such instances the Board often dismisses the appeal and allows the party to refile the appeal after exhausting their administrative remedies with OSC.  PFR File, Tab 1 at 5-6.  Dismissal of an appeal in the circumstances described by the appellant is a dismissal for failure to prove exhaustion, which is a threshold determination.  *See Carney v. Department of Veterans Affairs*, 121 M.S.P.R. 446, ¶¶ 4-5 (2014) (stating that the first element to Board jurisdiction over an IRA appeal is exhaustion by the appellant of his administrative remedies before OSC and that the next requirement is that the appellant nonfrivolously allege that he made a made a protected disclosure or engaged in protected activity).  In the prior appeal in this case, by contrast, the appellant specifically raised the challenged actions as necessary components to his claim that his resignation was involuntary, and the administrative judge made findings concerning each of the challenged actions as a part of his determination that the appellant failed to nonfrivolously allege that his resignation was involuntary.  0233 ID at 4-8; *see* 0233 IAF, Tabs 4, 11.  Having received a determination as to each of those issues in the prior initial decision, the appellant is now seeking to relitigate those same issues in his IRA appeal, which the administrative judge correctly determined that he is estopped from doing.

¶17     Accordingly, we find that the administrative judge properly determined that the appellant was collaterally estopped from challenging Personnel Actions 2, 3,

and 4, concerning his proposed termination, his involuntary resignation, and the agency's refusal to allow him to withdraw his resignation agreement, in the instant appeal.

The appellant established Board jurisdiction over some of the remaining claims in his IRA appeal.

¶18     We now turn to consideration of the portion of the appellant's appeal that the administrative judge determined he was not collaterally estopped from re-litigating in the instant appeal, which includes his claim that in reprisal for his five protected disclosures, agency officials subjected him to a significant change in his duties, responsibilities, and working conditions by setting impossible and unobtainable deadlines and by altering his performance plan in an onerous manner.  IAF, Tab 8 at 14; *see* ID at 9.

¶19     To establish jurisdiction in an IRA appeal, an appellant must show by preponderant evidence[3] that he exhausted his remedies before OSC.  He must also make nonfrivolous allegations of the following:  (1) he made a disclosure described under 5 U.S.C. § 2302(b)(8) or engaged in a protected activity described under 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D); and (2) the disclosure or protected activity was a contributing factor in the agency's decision to take or fail to take a personnel action as defined by 5 U.S.C. § 2302(a). *Corthell v. Department of Homeland Security*, 123 M.S.P.R. 417, ¶ 8 (2016).  The Board's regulations define a nonfrivolous allegation as an assertion that, if proven, could establish the matter at issue.     5 C.F.R. § 1201.4(s).[4]    As the

---

[3] Preponderant evidence is the degree of relevant evidence that a reasonable person, considering the record as a whole, would accept as sufficient to find that a contested fact is more likely to be true than untrue.  5 C.F.R. § 1201.4(q).

[4] The regulation further provides that an allegation generally will be considered nonfrivolous when, under oath or penalty of perjury, an individual makes an allegation that:  (1) is more than conclusory; (2) is plausible on its face; and (3) is material to the legal issues in the appeal.  *Id.*  Pro forma allegations are insufficient to meet the nonfrivolous standard.  *Clark v. U.S. Postal Service*, 123 M.S.P.R. 466, ¶ 6 (2016),

U.S. Court of Appeals for the Federal Circuit explained in *Hessami v. Merit Systems Protection Board*, [979 F.3d 1362](#), 1364, 1369 (Fed. Cir. 2020):[5] "[T]he question of whether the appellant has non-frivolously alleged protected disclosures [or activities] that contributed to a personnel action must be determined based on whether the employee alleged sufficient factual matter, accepted as true, to state a claim that is plausible on its face." Any doubt or ambiguity as to whether the appellant made nonfrivolous jurisdictional allegations should be resolved in favor of affording the appellant a hearing. *Grimes v. Department of the Navy*, [96 M.S.P.R. 595](#), ¶ 12 (2004). Whether the appellant's allegations can be proven on the merits is not part of the jurisdictional inquiry. *Lane v. Department of Homeland Security*, [115 M.S.P.R. 342](#), ¶ 12 (2010).

¶20        A disclosure protected under section 2302(b)(8) is one which an employee reasonably believes evidences any violation of any law, rule, or regulation, or gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety. *Mudd v. Department of Veterans Affairs*, [120 M.S.P.R. 365](#), ¶ 5 & n.3 (2013); *see* [5 U.S.C. § 2302](#)(b)(8). The proper test for determining whether an employee had a reasonable belief that his disclosures were protected is whether a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee could reasonably conclude that the actions evidenced any of the conditions set forth in

*aff'd*, 679 F. App'x 1006 (Fed. Cir. 2017) *and overruled on other grounds by Cronin v. U.S. Postal Service*, [2022 MSPB 13](#), ¶ 20 n. 11.

[5] Historically, the Board has been bound by the precedent of the Federal Circuit on these types of whistleblower issues. However, pursuant to the All Circuit Review Act, Pub. L. No. 115-195, appellants may file petitions for judicial review of Board decisions in whistleblower reprisal cases with any circuit court of appeals of competent jurisdiction. *See* [5 U.S.C. § 7703](#)(b)(1)(B). Therefore, we must consider these issues with the view that the appellant may seek review of this decision before any appropriate court of appeal.

5 U.S.C. § 2302(b)(8).  *Mudd*, 120 M.S.P.R. 365, ¶ 5.  The disclosures must be specific and detailed, not vague allegations of wrongdoing.  *Salerno v. Department of the Interior*, 123 M.S.P.R. 230, ¶ 6 (2016).  In determining whether an appellant has made a nonfrivolous allegation of a disclosure, the Board will consider matters incorporated by reference, matters integral to the appellant's claim, and matters of public record.  *See Hessami*, 979 F.3d at 1369 n.5.

> *The appellant exhausted his administrative remedies with OSC regarding four of his purported disclosures and the single remaining personnel action.*

¶21    Under 5 U.S.C. § 1214(a)(3), an employee is required to seek corrective action from OSC before seeking corrective action from the Board.  *Mason v. Department of Homeland Security*, 116 M.S.P.R. 135, ¶ 8 (2011).  The Board, in *Chambers v. Department of Homeland Security*, 2022 MSPB 8, ¶¶ 10-11, clarified the substantive requirements of exhaustion.  The requirements are met when an appellant has provided OSC with a sufficient basis to pursue an investigation.  The Board's jurisdiction is limited to those issues that previously have been raised with OSC.  However, appellants may give a more detailed account of their whistleblowing activities before the Board than they did to OSC.  Appellants may demonstrate exhaustion through their initial OSC complaint, evidence that they amended the original complaint, including but not limited to OSC's determination letter and other letters from OSC referencing any amended allegations, and their written responses to OSC referencing the amended allegations.  Appellants also may establish exhaustion through other sufficiently reliable evidence, such as an affidavit or a declaration attesting that they raised with OSC the substance of the facts in the Board appeal.  *Id*.  With his jurisdictional pleadings, the appellant provided a copy of his submitted OSC complaint, which includes his sworn declaration and correspondences with OSC.  IAF, Tab 8 at 33-68.  He also provides a copy of OSC's close-out letter.  *Id.* at 87.

¶22    In his jurisdictional filings, the appellant identified his protected disclosures as follows:

> 1.    In the summer of 2016, he complained to various agency officials concerning Private Company 1's (PC 1) failure to maintain a proper Resource Recovery and Protection Plan (R2P2) in violation of the Surface Mining Control and Reclamation Act of 1977 (SMCRA) (30 U.S.C. § 1201, *et seq.*) and the Mineral Leasing Act of 1920 (MLA) (30 U.S.C. § 181, *et seq.*);
>
> 2.    During the period from October 2016 through January 2017, he complained to various agency officials that PC 1 was responsible for a spoil pile slide, causing a potential danger to public health and safety, a significant loss of revenue to the Federal Government, and potential violations of 43 C.F.R. § 3481.1(c) and 30 C.F.R. § 77.1000;
>
> 3.    He disclosed to his first-line supervisor in November 2016 that the Mine Safety and Health Administration (MSHA) needed to conduct an investigation into the source of the spoil pile slide discussed in Disclosure 2, and he disclosed the need to conduct an investigation into the slide to an MSHA inspector in mid to late-November 2016[6];
>
> 4.    In a December 15, 2016 memorandum to his first and second-line supervisors, he disclosed his belief that, during a call with a representative of PC 1's parent company, the representative made "an illegal and unethical attempt to influence the outcome or stop the spoil slide investigation"; and
>
> 5.    At some time after December 21, 2016, he disclosed to the agency's HR Director that his relationship with his supervisors had deteriorated and that he was being subjected to a hostile work environment by agency officials following his disclosure in the December 15, 2016 memorandum.

Tab 16 at 4-7; *see* IAF, Tab 8 at 13-14.

¶23    In the initial decision, the administrative judge did not make any specific findings concerning which, if any, of the purported disclosures the appellant exhausted with OSC. Nevertheless, on petition for review the appellant does not challenge the administrative judge's finding that Disclosure 5 was not protected

---

[6] The appellant identifies the date of this purported disclosure as "mid to late November 2014," but it is clear based on the context that the intended date is mid-to late-November 2016. *See* IAF, Tab 16 at 5-6.

because it was "vague and lacking in specifics" and did not identify any of the types of wrongdoing described in section 2302(b)(8). *See* PFR File, Tab 1 at 6-9. Instead, the appellant alleges only that the administrative judge erred in concluding that Disclosures 1-4 were not protected because they only disclosed wrongdoing by a nongovernmental entity, as opposed to wrongdoing by the Government. PFR File, Tab 1 at 6-9. Accordingly, we limit our review here to Disclosures 1-4.

¶24    In the sworn declaration the appellant provided to OSC with his complaint, he specifically identifies his complaint about PC 1's failure to maintain an updated and approved R2P2 starting in May or June of 2016 (Disclosure 1), his complaints about the agency's handling of its investigation into PC 1's role in the spoil pile slide starting in early October 2016 (Disclosure 2), his efforts to get MSHA to investigate PC 1's role in the spoil pile slide in late November 2016 (Disclosure 3), and his December 15, 2016 memorandum describing PC 1's unlawful attempts to influence the investigation into the spoil pile slide (Disclosure 4). IAF, Tab 8 at 48-62. The appellant also provided OSC with a copy of the memorandum described in Disclosure 4. *See id.* at 62; IAF, Tab 16 at 8-9. Although OSC's close-out letter does not specifically identify the nature of the disclosures it investigated, *see* IAF, Tab 8 at 87, we nevertheless find that the appellant proved by preponderant evidence that he exhausted his administrative remedies with OSC regarding Disclosures 1-4.

¶25    With respect to the single remaining personnel action—the appellant's allegation that agency officials changed his work duties by altering his performance plan by setting impossible and unobtainable hard dates and fixed deadlines for tasks that previously did not have fixed dates, and by otherwise harassing him—the administrative judge determined that the appellant nonfrivolously alleged that this constituted a significant change in the appellant's duties and/or responsibilities, and thus constituted a personnel action under

5 U.S.C. § 2302(a)(2)(A)(xii). ID at 9 n.8; *see* IAF, Tab 8 at 10-11, 14-15; Tab 16 at 6-7.

¶26     The Board has found that the creation of a hostile work environment may constitute a personnel action under 5 U.S.C. § 2302(a)(2)(A)(xii) to the extent that is represents a significant change in duties, responsibilities, or working conditions. *See Savage v. Department of the Army*, 122 M.S.P.R. 612, ¶ 23 (2015). To meet this standard, an agency's actions must, individually or collectively, have practical and significant effects on the overall nature and quality of an employee's working conditions, duties, or responsibilities. *Skarada v. Department of Veterans Affairs*, 2022 MSPB 17, ¶ 16. In determining whether a hostile work environment is present, the Board will consider the totality of the circumstances, including agency actions that may not individually rise to the level of a personnel action. *Id.*, ¶ 18.

¶27     Employees are not guaranteed a stress-free work environment, and the appellant's general assertion that he was "harassed" by agency officials would not, alone, suffice to rise to the level of a significant change in working conditions. *See Miller v. Department of Defense*, 85 M.S.P.R. 310, ¶ 32 (2000) (explaining that an employee is not guaranteed a working environment free of stress). However, the appellant's specific allegation that the nature of his work and his ability to meet workload demands changed after his first-level supervisor set fixed deadlines where none previously existed, does relate directly to a change in duties, responsibilities, and working conditions as contemplated by 5 U.S.C. § 2302(a)(2)(A)(xii). Specifically, the appellant alleged that although the fiscal year 2017 performance period officially began on October 1, 2016, his first-level supervisor did not provide him with a performance plan until well into the performance period, on December 21, 2016 (which the appellant states was a few days after one of his purported disclosures, and around the same time that he alleges his supervisor began harassing him about the spoil pile slide investigation), leaving him without any goals or guidance on what he was

supposed to achieve during a large portion of the performance rating period. IAF, Tab 8 at 10, 14; Tab 16 at 7. He further alleges that the performance plan he was provided on December 21, 2016 identified impossible to meet hard deadlines, even though no such hard deadlines had been assigned in the past, and even though no other employee in the office was subjected to similar hard deadlines. IAF, Tab 8 at 10.

¶28    Construing the appellant's jurisdictional pleadings in the most favorable possible light, we find that he provided adequate substance to support his claim that the change in his performance plan and the harassment by his first-level supervisor significantly changed his job duties in a manner that would have a practical and significant effect on the overall nature and quality of his duties, responsibilities, and working conditions. *See Skarada*, 2022 MSPB 17, ¶ 16. Accordingly, we find that he made a nonfrivolous allegation that he was subjected to a personnel action under 5 U.S.C. § 2302(a)(2)(A)(xii). Moreover, insofar as the appellant provided documentation demonstrating that he raised this allegation with OSC, we also find that he showed that he exhausted his administrative remedies with respect to this claim. *See* IAF, Tab 8 at 43, 62-63.

> *The administrative judge erred in determining that Disclosures 1-4 were categorically unprotected because they involved the disclosure of wrongdoing by a private company as opposed to wrongdoing by the Government.*

¶29    The administrative judge's determination that a disclosure is only protected under 5 U.S.C. § 2302(b)(8) if it concerns alleged wrongdoing by the Government is not supported by the relevant case law. *See* ID at 10-11. In reaching this determination, the administrative judge relied on language from the Federal Circuit's decision in *Giove v. Department of Transportation*, 230 F.3d 1333, 1338 (Fed. Cir. 2000), as cited in *Young v. Merit Systems Protection Board*, 961 F.3d 1323, 1328 (Fed. Cir. 2020). ID at 10-11. As the appellant correctly notes on review, the language the administrative judge cites from *Giove* merely sets out the test for determining whether a disinterested observer's belief that he is

disclosing activity protected under section 2302(b)(8) is reasonable, and says nothing about whether wrongdoing by a nongovernmental entity is categorically unprotected. PFR File, Tab 1 at 7-9; *see Giove*, 230 F.3d at 1338.

¶30        Instead, the Board has held that disclosures of wrongdoing by nongovernmental entities may constitute protected disclosures when the Government's reputation, interests, and good name are implicated in the alleged wrongdoing, and the employee shows that he reasonably believed that the information he disclosed evidenced that wrongdoing. *See Voorhis v. Department of Homeland Security*, 116 M.S.P.R. 538, ¶ 30 (2011) (stating that disclosures may be protected if they "implicate the reputation and good name of the [F]ederal [G]overnment"), *aff'd*, 474 F. App'x 778 (Fed. Cir. 2012); *Miller v. Department of Homeland Security*, 99 M.S.P.R. 175, ¶¶ 12-13 (2005) (finding that the appellant's disclosure regarding alleged wrongdoing by state Government officials was protected because the state and Federal agencies were engaged in a joint operation, and the alleged misconduct by the state employees as part of that joint operation implicated the Federal Government's interests and good name); *Johnson v. Department of Health and Human Services*, 93 M.S.P.R. 38, ¶¶ 10-11 (2002) (finding that the Government's interests and reputation were implicated by the appellant's disclosure that agency officials ignored contract violations and irregularities that cost the Government thousands of dollars and ignored a contractor's hiring of undocumented aliens); *Arauz v. Department of Justice*, 89 M.S.P.R. 529, ¶ 7 (2001) (finding that the appellant's disclosure regarding alleged wrongdoing by a private organization was protected when it performed functions related to the agency's outreach program and the agency was in a position to influence or exercise oversight over the organization's performance of those functions, such that the Government's interests and good name were implicated in the wrongdoing).

¶31        Accordingly, we conclude that the administrative judge erred when he determined that Disclosures 1-4 were categorically unprotected because they

involved the disclosure of wrongdoing by a private company as opposed to wrongdoing by the Government. *See* ID at 9-11. We turn now to review each of the appellant's purported disclosures to consider whether they alleged wrongdoing by a nongovernmental entity that nevertheless implicated the Government's reputation, interest, and good name, and whether the appellant could have reasonably believed that the information he was disclosing evidenced that wrongdoing.

### i. *Disclosure 1*

¶32    As previously discussed, Disclosure 1 concerned the appellant's complaints to agency officials concerning PC 1's failure to maintain a proper R2P2[7] in violation of the SMCRA (codified at 30 U.S.C. § 1201, *et seq.*) and the MLA (codified at 30 U.S.C. § 181, *et seq.*). IAF, Tab 8 at 13-14; Tab 16 at 4-7. In concluding that this disclosure was unprotected because it evidenced wrongdoing only by PC 1 and not by the Government, the administrative judge appears to have concluded that, because it was PC 1's obligation to maintain a copy of its most recent R2P2 on-site at its mining location, its failure to do so only constituted wrongdoing on its own part. ID at 11 (citing *Young*, 961 F.3d at 1328). However, this represents an unduly narrow reading of the appellant's allegations contained in Disclosure 1.

¶33    In describing the nature of Disclosure 1, the appellant alleged that agency officials, including his first-line supervisor, gave preferential treatment to PC 1 by allowing them to replace a lost R2P2 in a manner inconsistent with agency policy and with Federal laws and regulations. *Id.* at 51-57. Specifically, he alleges that after he was assigned to investigate PC 1's request to bypass a coal

---

[7] The appellant describes an R2P2 as "a plan that shows proposed operations that meet statutory requirements for mine extraction," and notes that R2P2s must be submitted to and approved by BLM before any coal extraction operations can be commenced, pursuant to 43 C.F.R. §§ 3480.0-5(34) and 3482.1(b). IAF, Tab 8 at 49.

seam[8] for economic reasons in March 2016, he found irregularities in the financial and cost data PC 1 initially provided to him, so he attempted to obtain the agency's copy of the original R2P2 from the storage vault. *Id.* at 52-53. After failing to find the agency's copy of the R2P2, he requested a copy directly from PC 1 on the recommendation of his first-level supervisor, which PC 1 was unable to produce. *Id.* at 53. After additional unsuccessful attempts to obtain PC 1's original copy of the R2P2, the appellant proposed that the agency issue PC 1 a letter of noncompliance regarding its failure to maintain the original R2P2, but his first-line supervisor directed him not to do so and to work with PC 1 instead. *Id.* at 54. Shortly thereafter, PC 1 hired a consultant who generated and submitted a new R2P2 in June 2016, which was subsequently approved in July 2016. *Id.*

¶34    The appellant alleged that by allowing PC 1 to generate a new R2P2 when they could not find the original and most current R2P2 in May 2016, and later approving the bypass request based on this new R2P2, his first-line supervisor violated agency policies and Federal laws and regulations, including section 523(a) and 523(c) of the SMCRA, which governs the nondelegation of mining plan approvals on Federal lands, and 43 C.F.R. § 3482.1(c)(7), which sets out the requirements for how a bypass request should be reviewed and approved by authorizing officers. *Id.* at 43, 54-56. The appellant also noted that his first-line supervisor informed him that PC 1 had previously threatened to call its Congressional representative in response to agency actions in the past, alleged that the agency's preferential treatment toward PC 1 was the result of "a management philosophy and decision-making that favored [PC 1]," and asserted that the actions described may represent a case of "regulatory capture," which he

---

[8] The appellant describes a "bypass" as an exemption that "allows an operator not to mine a seam of coal that is covered in the most currently approved R2P2 due to changed geological or economic conditions." IAF, Tab 8 at 52 (citing 43 C.F.R. § 3482.2(b)(2)).

defined as a circumstance where "regulatory agencies may come to be dominated by the industries or interests they are charged with regulating." *Id.* at 51-52.

¶35      In *Arauz*, 89 M.S.P.R. 529, ¶¶ 6-7, the Board found that the appellant's disclosure that a private organization operating under a Federal outreach program had violated state voter registration laws, fell within the Whistleblower Protection Act of 1989 because "the essence of those disclosures was that the [G]overnment program under which the private organization was operating was being used to facilitate wrongdoing . . . [and] if this alleged wrongdoing were allowed to continue, the agency could be viewed as an accessory to the wrongdoing . . . and [] the [G]overnment's interests and reputation therefore were implicated in the alleged wrongdoing." *See Covington v. Department of the Interior*, 2023 MSPB 5, ¶¶ 8-9 (finding that the Whistleblower Protection Enhancement Act of 2012 (WPEA) did not change the longstanding principle that a disclosure of wrongdoing committed by a non-Federal Government entity may be protected only when the Federal Government's interests and good name are implicated in the alleged wrongdoing). Similarly, in the instant case, although the crux of the appellant's allegations in Disclosure 1 concern PC 1's wrongdoing based on its failure to maintain an original copy of its R2P2, the appellant also alleges that agency officials intentionally turned a blind eye to PC 1's wrongdoing by denying his request to issue a notice of noncompliance concerning the R2P2 and by eventually approving the bypass request based on a new R2P2 due, in part, to the agency's close relationship with PC 1. Given the investigatory and oversight functions the agency exercised over PC 1, the perception that the agency was neglecting to fulfill its statutory functions because of its favorable relationship with PC 1 could call into question the Government's interest and reputation, and therefore implicate the Government in the alleged wrongdoing. As such, in Disclosure 1, the appellant alleged wrongdoing by a nongovernmental entity that nevertheless implicated the Government's reputation, interest, and good name, and therefore it is not precluded from consideration as a protected disclosure on

that basis. Because of the administrative judge's contrary finding, he did not consider whether Disclosure 1 otherwise met the requirements of a nonfrivolous allegation of retaliation for whistleblowing.

¶36 Considering the appellant's professional expertise in this area and the fact that at the jurisdictional stage, an appellant need only provide sufficient specificity and substantiality to support a reasonable belief that he disclosed evidence of one of the categories of wrongdoing described in section 2302(b)(8), we conclude that he could have reasonably believed that he was disclosing wrongdoing that implicated the Government's interests and good name when he disclosed that PC 1 failed to maintain an original R2P2 in May 2016, but was nevertheless permitted to resubmit a new R2P2 and was later granted a bypass request based on that R2P2, in violation of Federal laws and regulations. *See Embree v. Department of the Treasury*, 70 M.S.P.R. 79, 85 (1996) (considering the appellant's asserted subject matter expertise in finding that she made a nonfrivolous allegation of gross mismanagement); *Van Ee v. Environmental Protection Agency*, 64 M.S.P.R. 693, 698 (1994) (considering the appellant's expertise in finding that she made a nonfrivolous allegation of a gross waste of funds). Consequently, we conclude that the appellant made a nonfrivolous allegation that he disclosed a violation of law or regulation in connection with Disclosure 1.

### ii. *Disclosure 2*

¶37 For Disclosure 2 the appellant alleges that during the period from October 2016 through January 2017, he complained to agency officials concerning PC 1's role in causing a spoil pile slide that resulted in 180,000 tons of Federally-owned coal being rendered unrecoverable, caused a loss of approximately $900,000 in revenue to the Federal Government, endangered public health and safety, and potentially constituted a violation of 43 C.F.R. § 3481.1(c) and 30 C.F.R. § 77.1000. IAF, Tab 8 at 8, 13-14; Tab 16 at 5. The administrative judge determined that this disclosure was unprotected because it

represented an allegation of wrongdoing by PC 1 and not by the Government, again citing the Board's decision in *Young*.  ID at 11.

¶38     As described by the appellant, a "spoil pile" as "a pile of debris that is generated from removing the ground over the coal seam." IAF, Tab 8 at 8.  After removal, the waste debris is piled up next to the area being mined, and if improperly maintained by the mining company, the material in the debris pile can spill or "slide," causing damage and/or injury.  *Id.* at 8, 57 n.1.  However, spoil pile slides do not exclusively occur due to negligence, and can also be triggered by seismic activity from blasting or by significant rainfall events.  *Id.* at 58-59. After being informed that a spoil pile slide occurred at PC 1's mining operation site in early October 2016, the appellant sought to investigate the source of the slide in order to determine whether it was the result of PC 1's negligence, because if PC 1 was at fault for the slide it could be liable for lost royalties owed to the Federal Government, pursuant to 43 C.F.R. § 3480.0-1, *et seq.* and 43 C.F.R. § 3481.1(c).  *Id.* at 58.

¶39     After receiving initial reports indicating that PC 1's actions may have contributed to the spoil pile slide, the appellant requested authorization to investigate the matter, but he was informed that BLM did not have the expertise to investigate the slide and his request to hire an outside consultant was denied. *Id.* at 59.  Instead, it was decided that the appellant would reach out to a different Federal or state agency to assist with the investigation.  *Id.*  The appellant eventually contacted the Mine Safety and Health Administration (MSHA) within the Department of Labor, which is the agency that approved PC 1's ground control plan and was responsible for enforcing compliance with mandatory safety and health standards, and thus was the agency properly tasked with completing the spoil slide investigation.  *Id.* at 59-62.  During a subsequent conference call between the appellant, his first line supervisor, and representatives of MSHA, it was agreed that MSHA would conduct the spoil pile slide investigation and that the appellant should not be involved in the investigation.  *Id.* at 62.

¶40     On January 10, 2017, an MSHA representative emailed the appellant the results of its investigation, which concluded that PC 1 was in compliance with its ground control plan and was not directly responsible for the spoil pile slide. *Id.* at 64. The appellant disputed the findings, concluding that the analysis was incomplete and based on erroneous assumptions, and raised his concerns with his first-line supervisor, who informed him that BLM was out of options with respect to investigating the spoil pile slide. *Id.* The supervisor subsequently directed the appellant to issue a letter to PC 1 stating that BLM would not be holding them financially accountable for the lost coal royalties that resulted from the spoil pile slide. *Id.* Because the appellant disagreed with this determination, he was permitted to revise the letter to make it clear that "it was MHSA that made the call to absolve [PC 1] of responsibility instead of the BLM." *Id.*

¶41     Based on our review of the appellant's jurisdictional pleadings, we conclude that he has failed to make a nonfrivolous allegation that Disclosure 2 was protected because he has not explained how his belief that PC 1 was at fault for the spoil pile slide implicated the Government's reputation, interest, and good name. As described in detail above, the appellant's own submissions reflect that MSHA was the agency tasked with completing the spoil slide investigation, not BLM, and BLM's only interest concerned the recovery of lost royalties due to the Federal government *in the event that* PC 1 was determined to be responsible for the spoil pile slide. IAF, Tab 8 at 57-62. Because, by the appellant's own admission, BLM had no role in assessing fault for the spoil pile slide, the agency's subsequent failure to pursue damages for lost royalties from PC 1 could not have reflected poorly on the Government's reputation, interest, and good name. Although the appellant may have had sincere disagreements with the determination reached by MSHA, because BLM had no role in conducting the investigation, the finding absolving PC 1 of fault and the manner in which it was reached could not have negatively reflected on the Government's reputation, interest, and good name.

¶42     For the foregoing reason, we conclude that the appellant has failed to show that Disclosure 2 contains any allegation of wrongdoing by the Government, and instead merely reflected his personal or philosophical disagreement with the determination by MSHA that PC 1 was not at fault for the pile slide.[9]  *See Webb v. Department of the Interior*, 122 M.S.P.R. 248, ¶ 8 (2015) (noting that even under the expanded protections afforded to whistleblowers under the WPEA, general philosophical or policy disagreements with agency decisions or actions are not protected unless they separately constitute a protected disclosure of one of the categories of wrongdoing listed in section 2302(b)(8)(A)); *see* 5 U.S.C. § 2302(a)(2)(D).  Accordingly, we agree with the administrative judge's conclusion that the appellant failed to nonfrivolously allege that he made a protected disclosure with respect to Disclosure 2, as modified here to supplement the analysis regarding this disclosure.

### iii.   *Disclosure 3*

¶43     Disclosure 3 also concerned the spoil slide investigation, but related to the appellant's efforts to get MSHA involved in investigating the source of the slide. Specifically, the appellant alleges that he disclosed the need to involve MSHA in the investigation to his first-line supervisor in November 2016, and disclosed to MSHA representatives directly that they needed to investigate the slide in late-November 2016.  IAF, Tab 8 at 60-61.  For the reasons addressed in greater detail above, we also conclude that the appellant failed to nonfrivolously allege that he made a protected disclosure with respect to Disclosure 3 because he failed to show that he reasonably believed that he was disclosing wrongdoing that implicated the Government's reputation, interests, and good name in connection

---

[9] We note that the provision the appellant identifies that he believed PC 1 violated in connection with the spoil pile slide, 30 C.F.R. § 77.1000, is promulgated within MSHA's regulations, not BLM's, further supporting the conclusion that the appellant's objections represented a policy disagreement over which BLM had no authority.  *See* IAF, Tab 8 at 13, 60-61.

with this purported disclosure. The appellant does not allege and there is no indication that anyone at BLM was authorized to instruct or direct MSHA to conduct the investigation into PC 1's role in the spoil pile slide. As with Disclosure 2, because the appellant acknowledges that BLM appropriately did not play a role in the determination of PC 1's fault for the spoil pile slide, any inaction by BLM against PC 1 could not have reflected poorly on the Government or implicated the Government's reputation, interests, and good name. *Cf. Covington*, 2023 MSPB 5, ¶¶ 7-9 (finding that the appellant's disclosures regarding alleged wrongdoing by the Navajo Nation, a non-Federal Government entity, were not protected because the Government's good name and interests were not implicated). Consequently, we agree with the administrative judge's determination that the appellant failed to nonfrivolously allege that he made a protected disclosure in connection with Disclosure 3.[10]

---

[10] Although unaddressed in the initial decision, the appellant separately alleged that his communication to MSHA requesting their involvement in the spoil slide investigation constituted protected activity under 5 U.S.C. § 2302(b)(9)(C), because he was "cooperating with or disclosing information to the Inspector General (or any other component responsible for internal investigation or review) of an agency." IAF, Tab 16 at 5 (quoting 5 U.S.C. § 2302(b)(9)(C)). The statutory language cited by the appellant was added to section 2302(b)(9)(C) as a part of the National Defense Authorization Act for Fiscal Year 2018 (NDAA), Pub. L. No. 115-91, 131 Stat. 1283, which was signed into law on December 12, 2017. The NDAA amended 5 U.S.C. § 2302(b)(9)(C) to provide protections for individuals who cooperate with or disclose information to the Inspector General "or any other component responsible for internal investigation or review," while the prior statutory language covered only individuals "cooperating with or disclosing information to the Inspector General of an agency . . . ." *See* 131 Stat. 1283, 1618. However, the expanded language does not apply here because all of the relevant events at issue in this appeal occurred prior to December 12, 2017, and the Board has held that the changes to this provision do not apply retroactively. *Edwards v. Department of Labor*, 2022 MSPB 9, ¶¶ 29-33 (finding that the changes to section 2302(b)(9)(C) do not apply retroactively), *aff'd*, No. 2022-1967, 2023 WL 4398002 (Fed. Cir. July 7, 2023). Accordingly, the appellant's communications with MSHA did not constitute protected activity under section 2302(b)(9)(C).

*iv.* *Disclosure 4*

¶44    Disclosure 4 was a December 15, 2016 memorandum the appellant provided to his first and second-line supervisors describing what he believed to be "illegal and unethical attempts" by a representative of PC 1's parent company to influence the outcome of the spoil slide investigation.  IAF, Tab 16 at 6.  The appellant alleges that after he contacted the MSHA representative who agreed to conduct the spoil slide investigation into PC 1, on December 14, 2016, his first-line supervisor informed him that he had received several voicemail messages from the Chief Operations Officer of PC 1's parent company.  IAF, Tab 8 at 62; *see id.* at 51.    The appellant and his supervisor returned the call to the PC 1 representative, and during the call the representative proceeded to complain about the fact that BLM had requested MSHA to investigate the spoil slide, made disparaging remarks about the appellant and his reputation, and yelled at the appellant's supervisor and instructed him that he better "fix the relationship" between the agency and PC 1.  *Id.* at 62.  The following day, the appellant drafted a memorandum in which he memorialized what had occurred during the call the previous day and requested that he be removed from duties associated with PC 1 and its parent company, and delivered it to his first and second-line supervisors. IAF, Tab 8 at 62; *see* IAF, Tab 16 at 8-9.

¶45    We conclude that he has failed to nonfrivolously allege that Disclosure 4 is protected because he has not explained how the described actions taken by the PC 1 representative implicate the Government's reputation, interest, and good name.  The wrongdoing the appellant identifies exclusively concerns the behavior by PC 1's representative attacking his character and attempting to discourage him from investigative efforts, and nothing in the provided memorandum identifies any action by agency officials encouraging or permitting PC 1's efforts to impede the investigation.  *See* IAF, Tab 16 at 8-9.  The closest the appellant comes to suggesting any sort of complicity in PC 1's wrongdoing by any agency official is his assertion that his supervisor did nothing to "speak up and defend" the

appellant's reputation from the personal attacks by PC 1's representative during the call, but even if true, such conduct does not rise to the level of implicating the Government in PC 1's wrongdoing. IAF, Tab 8 at 62. Accordingly, we also agree that the appellant failed to nonfrivolously allege that he made a protected disclosure in connection with Disclosure 4.

*The appellant nonfrivolously alleged that Disclosure 1 contributed to the significant change in his duties, responsibilities, and working conditions, and is therefore entitled to a hearing on the merits regarding Disclosure 1.*

¶46    Having determined that the appellant nonfrivolously alleged that he made one protected disclosure and was subjected to one personnel action, we must now consider whether he has established that his disclosure was a contributing factor in the agency's decision to take the personnel action. A protected disclosure is a contributing factor if it affects an agency's decision to take a personnel action. *Dorney v. Department of the Army*, 117 M.S.P.R. 480, ¶ 14 (2012). The most common way of proving contributing factor is through the knowledge/timing test of 5 U.S.C. § 1221(e). *Ayers v. Department of the Army*, 123 M.S.P.R. 11, ¶ 25 (2015). Under that test, an appellant can prove the contributing factor element through evidence that the official taking the personnel action knew of the whistleblowing disclosure and took the personnel action within a period of time such that a reasonable person could conclude that the disclosure was a contributing factor in the personnel action. *Id.*

¶47    Regarding the "knowledge" prong of the test, the appellant states that he informed his first-, second-, and third-line supervisors about Disclosure 1 in "late May/early June 2016," and specifically identifies that he disclosed his concerns about PC 1's failure to maintain a current R2P2 to his first-line supervisor during a verbal discussion during the "May to June 2016" timeframe, and complained to his first-line supervisor that PC 1's bypass request should not be approved sometime in late June to mid-July 2016. IAF, Tab 8 at 13, 56; Tab 14 at 5; Tab 16 at 4-5. Regarding the "timing" component of the test, the appellant

alleges that the significant change in his duties occurred on or around December 21, 2016, when his first-line supervisor set hard deadlines for his performance plan for the first time and began otherwise harassing him, which was approximately 5 to 6 months after he alleges he began disclosing PC 1's wrongdoing in connection with Disclosure 1, and within the 1 to 2 year period the Board has found such disclosures protected.  IAF, Tab 8 at 10, 14, Tab 16 at 7; *see Peterson v. Department of Veterans Affairs*, 116 M.S.P.R. 113, ¶ 16 (2011) (holding that personnel actions taken within 1 to 2 years of the protected disclosure satisfy the timing prong of the knowledge/timing test).

¶48      We have concluded that the appellant has made a nonfrivolous allegation that Disclosure 1 was protected, and that it resulted in a significant change in his duties, responsibilities, and working conditions.  Accordingly, we find that the appellant has established jurisdiction over his appeal, and that he is entitled to an adjudication of the merits regarding this claim, including his requested hearing.

¶49      We note that it appears that the appellant may have made Disclosure 1 in connection with his duties to investigate and disclose compliance with Federal resource extraction laws and regulations.  *See* 0233 IAF, Tab 6 at 29-3.  Pursuant to 5 U.S.C. § 2302(f)(2), an appellant who makes a disclosure in the normal course of his duties must additionally show that the agency took the action "in reprisal for" his disclosure, and it thereby imposes a slightly higher burden for proving that the disclosure was protected.  *Salazar v. Department of Veterans Affairs*, 2022 MSPB 42, ¶ 11.  The National Defense Authorization Act for Fiscal Year 2018 (2018 NDAA) amended 5 U.S.C. § 2302(f)(2) to provide that it only applies to employees whose principal job functions are to regularly investigate and disclose wrongdoing, *Salazar*, 2022 MSPB 42, ¶¶ 13-14, and that that amendment is entitled to retroactive effect.  *Id.*, ¶¶ 15-21.  The Board has recently clarified that the potential applicability of 5 U.S.C.§ 2302(f)(2) is not part of the jurisdictional analysis in an IRA appeal, and should instead be considered at the merits stage.  *Williams v. Department of Defense*, 2023 MSPB 23, ¶ 12.

¶50     Here, the administrative judge did not consider the applicability of 5 U.S.C. § 2302(f)(2) or the 2018 NDAA amendment.  On remand, the appellant must demonstrate by a preponderance of the evidence that his disclosure was protected under 5 U.S.C. § 2302(b)(8) and that it was a contributing factor in the contested personnel action.  5 U.S.C. § 1221(e)(1).  If the appellant's principal job function was to regularly investigate and disclose wrongdoing and he made his disclosures in the normal course of his duties, to establish that his disclosures were protected, the appellant must also prove that the agency had an improper, retaliatory motive for terminating him.

¶51     In conducting that analysis, the administrative judge should first determine whether:  (1) the appellant's primary job function at the time of the disclosure was to investigate and disclose wrongdoing; and (2) the disclosure was made in the normal course of the appellant's duties.  The administrative judge may consider these questions in whichever order is more efficient, and the parties should be provided an opportunity to submit relevant evidence and argument.  If either condition is unsatisfied, then section 2302(f)(2) does not apply, and the appellant's disclosures would fall under the generally applicable 5 U.S.C. § 2302(b)(8).  *Salazar*, 2022 MSPB 42, ¶ 22.  If conditions (1) and (2) are both satisfied, the administrative judge should next determine whether the appellant can meet his additional burden under section 2302(f)(2) by demonstrating that the agency took the contested personnel action "in reprisal" for his disclosure.  In doing so, the administrative judge should consider the totality of the evidence.  5 C.F.R. § 1201.4(q) (stating that the record as a whole should be considered when determining whether a party has met the preponderance of the evidence standard); *see Whitmore v. Department of Labor*, 680 F.3d 1353, 1368 (Fed. Cir. 2012) ("It is error for the MSPB to not evaluate all the pertinent evidence in determining whether an element of a claim or defense has been proven adequately.").

¶52     The determination of whether the agency took personnel actions "in reprisal for" the appellant's whistleblowing disclosures may include direct and circumstantial evidence encompassing the following factors:   (1) whether the agency officials responsible for taking the personnel action knew of the disclosures and the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosures were in reprisal for the personnel action; (2) the strength or weakness of the agency's reasons for taking the personnel action; (3) whether the disclosures were personally directed at the agency officials responsible for taking the action; (4) whether the acting officials had a desire or motive to retaliate against the appellant; and (5) whether the agency took similar personnel actions against similarly situated employees who had not made disclosures.  *Williams*, 2023 MSPB 23, ¶ 16.

¶53     If the administrative judge determines that section 2302(f)(2)'s extra proof requirement applies to Disclosure 1 and that the appellant established that he made this whistleblowing disclosure under this extra proof requirement, the burden then shifts to the agency to demonstrate by clear and convincing evidence that it would have taken the personnel actions in the absence of the appellant's whistleblowing, consistent with the following factors ("*Carr*" factors):   (1) the strength of the agency's evidence in support of its action; (2) the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision; and (3) any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated).  *Soto v. Department of Veterans Affairs*, 2022 MSPB 6, ¶ 11; *see also Carr v. Social Security Administration*, 185 F.3d 1318, 1323 (Fed. Cir. 1999).

## ORDER

¶54    For the reasons discussed above, we remand this case to the Denver Field Office for further adjudication in accordance with this Remand Order.[11]


FOR THE BOARD:                             <u>        /s/ for                    </u>
                                          Jennifer Everling
                                          Acting Clerk of the Board

Washington, D.C.

---

[11]  In the remand initial decision, the administrative judge may reincorporate prior findings as appropriate, consistent with this Remand Order.